## HUMBLE OIL & REFINING CO. v. STATE.

No. 9248.

Court of Civil Appeals of Texas. Austin.

Jan. 14, 1942.

Rehearing Denied Feb. 4, 1942.

T. H. McGregor and C. C. Small, both of Austin, and E. E. Townes, J. Q. Weatherly, Nelson Jones, and R. E. Seagler, all of Houston, for appellant.

Gerald C. Mann, Atty. Gen., and Glenn R. Lewis, Lee Shoptaw, Billy Goldberg, and Cecil C. Rotsch, Asst. Attys. Gen., for appellee.

McCLENDON, Chief Justice.

Suit by the State against the Humble (Humble Oil & Refining Company) to recover taxes allegedly due under the Chain Store Tax Act, Vernon's Ann.P.C. art. 1111d, Acts 1935, 44th Leg., 1st C.S. p. 1589, Ch. 400, for the years 1936–1941, inclusive, on the Humble's Texas filling or service stations. Section 5 excludes from the definition of stores taxed under the Act "any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles"; and the State's suit is predicated upon the theory that the Humble's service stations were not embraced in this exclusion, on the ground that the Humble sold at each of its stations during the taxing periods various specified automobile accessories in addition to petroleum products. See the Standard case (Standard Oil Co. of Texas v. State, Tex.Civ.App., 142 S.W. 2d 519, 523, error refused) considered below. The Humble's answer, while admitting that it sold in each of its stations some or all of the specified accessories, alleged that such sales were only incidental to "servicing" motor vehicles, and therefore its stations were within the above quoted exclusion, upon the following (substantially stated) alleged grounds: (1) The term "servicing of motor vehicles" has a well defined meaning in the service station business and includes the sale of accessories incidental and necessary to such servicing; (2) the history of the Act (set out in detail) in its passage through the legislature evidenced a legislative intention to so construe it; (3) in the alternative the expression "servicing of motor vehicles" is of doubtful meaning which doubt should be resolved in its favor under the strict construction doctrine of tax legislation in favor of the taxpayer; (4) departmental con-

struction of the Act. The answer further asserted that the Act is confiscatory, and therefore unconstitutional, if held applicable to its service station business. The allegations of the answer in these respects will be amplified below to the extent deemed essential to a clear understanding of the questions in issue. A general demurrer was sustained to this answer, and the case was tried upon agreed stipulation which admitted operation by the Humble of the several stations listed in the State's petition, and the sale at each of such stations of some or all of the alleged accessories, such sales being confined to those in which the accessories were actually installed upon motor vehicles in its stations. The judgment was in favor of the State for the full amount claimed, and the Humble has appealed.

The Humble has briefed its case under four points which we will consider in the order of their presentation.

■ Before doing so we will dispose of a motion by Humble to strike certain portions of the State's brief and a counter motion by the State to strike certain portions of Humble's brief. The State contends that the decision in the Standard case controls this case under the doctrine of stare decisis, and has attached as an exhibit to one of its briefs a printed copy of the application for writ of error in the Standard case in order to show what questions were passed upon by the Supreme Court in refusing the writ. It is this exhibit and certain statements in the State's brief regarding the issues before the courts in the Standard case that are the subjects of Humble's motion. The State's counter motion relates to similar statements in Humble's brief regarding the record showing and the issues actually involved in the Standard decision. Each side has cited numerous authorities and quoted copiously from decided cases and text writers, upon the doctrine of stare decisis. It is unnecessary to burden this opinion with a discussion of that subject. Independently of that doctrine Courts of Civil Appeals are bound by the decisions of the Supreme Court; and the refusal of a writ of error by that court has always been quite generally considered as an authoritative pronouncement by the Supreme Court approving the holdings of the Court of Civil Appeals which were essential to its decision. In 1927 the Legislature, with the manifest purpose of obtaining greater certainty regarding the effect of the Supreme Court's action upon writs of error, provided that the court should refuse the writ "where the judgment of the Court of Civil Appeals is a correct one and where the principles of law declared in the opinion of the court are correctly determined"; and "dismiss the case for want of jurisdiction" where the judgment was correct but the Supreme Court was not satisfied that the opinion in all respects had correctly declared the law. R.C. S. Art. 1728, as amended by Acts 40th Leg., p. 214, Ch. 144, § 1, Vernon's Ann. Civ.St. art. 1728. This effort at clarification, however, has not eliminated in every case the element of uncertainty as to the authoritative effect of a particular holding of the Court of Civil Appeals and resort to the application for writ of error may be had to assist in clarification of a doubtful issue. As illustrative of the practice of consulting the application for writ of error see State v. Hatcher, Tex.Civ.App., 52 S. W.2d 794; Hatcher v. State, 125 Tex. 84, 81 S.W.2d 499, 98 A.L.R. 1213. We sustain both motions in so far as they attempt to make portions of the record in the Standard case parts of the record in this case. We shall, however, consider the application in the Standard case to the extent we may deem helpful in determining what was decided by the Supreme Court in that case.

■ The Humble's first point reads: "Defendant having alleged that the language 'servicing of motor vehicles' is a phrase connected with the service station trade and that the signification attached to this phrase by experts in said trade includes all acts upon which plaintiff based this suit, it was error for the court to sustain a general demurrer to defendant's answer."

The Humble's answer sets forth at some length the rise and growth of motor vehicular use up to the year 1935; the construction of highways both state and national to accommodate that use; the practical universality of that use as a means of transportation; the inception and growth of the service station business; its necessity to motor vehicular use; the necessity for supplying motor vehicles with accessories, as a part of the service station business; and the inadequacy of other establishments dealing in such accessories. It is alleged in this connection that there was not a service station in Texas which did not sell accessories as part of its

servicing business; and that all of the stations under group management were operated by those "also engaged in the production, processing, and refining of crude oil and its manufacture into gasoline and other petroleum products." The paragraph asserting the trade meaning of the term in question we copy in full from Humble's brief:

"That prior to and at the time of the passage of H.B. 18, above referred to, the term 'servicing of motor vehicles' appearing in the Chain Store Tax law, were words used in connection with a particular trade or business known as the gasoline service station business, and said term, as used and understood in said business, circumscribed a business devoted exclusively to the fueling, lubricating and cleaning of motor vehicles, supplying air for tires, water for motors and supplying and servicing or attaching tire valve cores, automobile windshield wipers, automobile spark plugs, automobile fuses, automobile light bulbs, automobile fan belts, automobile battery cables, automobile batteries, automobile tires and automobile tire tubes, and such other parts as were incidental and beneficial to the principal business of selling gasoline, oil and petroleum products generally, such as were demanded by the motoring public, and such as the motoring public had grown accustomed to procuring from such places of business incidental to and in connection with their purchases of gasoline and oil; that the term 'servicing of motor vehicles' as used in the service station trade in 1935, and today, was generally understood to relate exclusively to a service station, as then and as now operated, engaged primarily in the sale of petroleum and its products and selling, incidental to such business, such accessories as are hereinabove specified, which are handled by it for the convenience of the motoring public and because of the demands of the motoring public."

The Humble's contentions under this point may be epitomized as follows:

Section 1 of Art. 10, R.C.S., relating to statutory construction reads: "The ordinary signification shall be applied to words, except words of art or words connected with a particular trade or subject matter, when they shall have the signification attached to them by experts in such art or trade, with reference to such subject matter."

The words "servicing of motor vehicles" as used in the Act are words "connected with a particular trade" (the service station business); the courts cannot judicially know the trade meaning of such words, but such meaning is a fact issue to be proved by the testimony of "experts in such trade"; this issue was not presented in the Standard case, and the decision in that case does not control the question in this case which was properly put in issue herein as a fact question. Wherefore, the general demurrer was erroneously sustained.

It is true that no trade meaning as distinguished from the common or popular meaning of "servicing of motor vehicles" was contended for in the application in the Standard case. The common meaning of the term was, however, most strenuously contended for as that term is generally understood in the service station business. The needs of the automotive traveling public and the general practice of sales of accessories by service stations as a part of the servicing of motor vehicles was vigorously urged in support of the contention that the term had acquired a well defined and generally accepted meaning when used in connection with the service station business. The considerations there urged in support of the general meaning of the term were substantially the same as those here urged in support of a trade meaning. And the same definition of the term according to its common or general meaning was contended for there as is contended for here as its trade meaning. In support of its contention the Standard cited a number of adjudicated cases. Also was cited the definition given in the 1934 edition of Webster's International Dictionary of the transitive verb "service": To perform services of maintenance, supply, repair, installation, distribution, etc., for or upon; as, to service a car, a radio set, a ship, a territory.

Nor do we think any serious question can now be raised but that the term as applied to the service station business has acquired such a general and commonly understood meaning as to require the courts to take judicial knowledge of it; and that that meaning accords in every respect with the trade meaning asserted by the Humble. The use of automotive vehicles is so general, and the service station so generally resorted to by the public that the common practice of service stations in supplying by sale automobile accessories in the servicing of motor vehicles as to impel such judicial knowledge. When the com-

mon or popular meaning of a term as applied to a business accords with the trade meaning thereof in that business, the latter becomes unimportant in determining the legislative intent in using the term in that connection.

■ The decision in the Standard case is clearly grounded upon the proposition that the legislature had itself defined what it meant to imply by the quoted term, and that for purposes of definition resort may not be had to the general meaning (nor, by parity of reasoning, to any other meaning) of the term nor to the practice of service stations in servicing automotive vehicles. In this connection the opinion quotes from Hurt v. Cooper, 130 Tex. 433, 110 S.W.2d 896, 904, relative to the meaning of store as defined in Section 7 of the Act, as follows: "The statute having defined the word, we are not concerned with its usual meaning. Under that definition a mercantile establishment at which goods, wares, or merchandise of any kind, except those exempted, are sold is a store and is taxable as such."

Quotation of like import is copied from the Fox case (Fox v. Standard Oil Co. of New Jersey, 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780).

The reasoning of the opinion is that to include in the meaning of "servicing of motor vehicles" sales of other than petroleum products would nullify the word "exclusively" in the expression, "place of business engaged exclusively in the * * * selling * * * of petroleum products," and thereby violate a cardinal canon of statutory construction "that every part of a statute should be given effect and that a construction should be avoided that will render any part of an act inoperative, nugatory or superfluous." This holding that the act itself excludes from the meaning of "servicing of motor vehicles" as used in the act any sale other than of petroleum products is made clear by the concluding portion of this subject in the opinion, which reads:

"If the language exempting only those engaged exclusively in selling petroleum products is given effect, a place that sells only petroleum products remains within the exemption and a place of business that engages in the selling of something more than petroleum products steps outside the exemption. The inclusion of the phrase 'servicing of motor vehicles' in the exemption may well be explained by fear that the

inhibiting language that precedes it might be construed so as to prohibit such a place of business from rendering the service (as distinguished from sale) usually rendered at such a place of business, such as the furnishing of air and water and washing and greasing of automobiles."

This holding being the basis upon which the decision was manifestly rested, it constituted a "principle of law declared in the opinion of the court," and the refusal of the writ was therefore a pronouncement of the Supreme Court that it was "correctly determined." R.C.S. Art. 1728, Subd. 6, as amended in 1927, Vernon's Ann.Civ.St. art. 1728, subd. 6. We therefore conclude that this holding is binding upon this court.

Humble's second point reads: "The statutory language for construction 'provided that the term "store". * * * wherever used in this act shall not include * * * any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles' is not an exemption from taxation but is the taxing provision relied upon by the State as imposing liability upon defendant and, therefore, the rule of liberal construction in favor of taxpayer and strict construction against the State applies."

■ The Humble's contention under this point is predicated upon the theory that the Standard decision is based upon a holding that the exclusion is an "exemption" to which the strict construction doctrine applies, and that the Standard case has been in effect overruled on this point by the later Supreme Court holding in the Bass case (Texas Unemployment Compensation Comm. v. Bass, 151 S.W.2d 567). Even were it conceded that the Standard decision was so predicated, we find no essential conflict in the two decisions. The asserted conflict is purely argumentative. Both cases were before the Eastland Court of Civil Appeals at the same time and decided within a week of each other. Applications for writs of error were before the Supreme Court at the same time. That in the Bass case was granted on account of the importance of the question September 25, 1940; that in the Standard case was refused the following week. The strict construction doctrine was considered and held not to apply to the Act involved in the Bass case. The doctrine was not alluded to in the Standard opinion; although the exclusion in Section 5 was referred to as an ex-

emption; as was also done in Hurt v. Cooper; and in Section 7 of the Act by use of the words "not specifically exempted within this Act" in defining "store". The two cases (Bass and Standard) involved the proper construction of different acts differently worded, and clearly the holding as to the applicability of a general legal doctrine to one of these acts would have no controlling effect as to its applicability to the other act. We think it would serve no useful purpose to burden this opinion with a comparative analysis of the two acts from the viewpoint of this issue. It is quite plain to us that the decision in the Standard case is not rested upon the strict construction doctrine, but upon the express holding that the statute could be given no other meaning than that any sale other than of petroleum products was excluded from the term "servicing of motor vehicles." The holding being that the legislative language was clear and unambiguous, there was no necessity to resort to the strict construction doctrine in its interpretation.

Humble's third point reads: "Under the state of facts reflected by defendant's answer and admitted by plaintiff's demurrer, the general rules of statutory construction require a holding that the service stations operated by defendant during the years involved in this suit were 'place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles,' and therefore, that such service stations were without the definition of the term 'store' as used in said Act."

Humble asserts for its construction of the Act under this point three grounds: (1) Legislative history, (2) departmental construction of the Act, and (3) legislative interpretation of the Act by the 1941 amendment of § 5.

As to the legislative history of the Act the contention is that this was imperfectly stated in the Standard opinion, and therefore the holding on that point is not binding in this case in which the full history of the Act is given.

The Standard's petition for writ of error does set out the legislative history of the Act as fully as does the Humble; and the Supreme Court therefore had before it that history in passing upon the petition.

■ The departmental construction contention is based upon these facts: The Attorney General's department gave an opinion shortly after the Act was passed to the Comptroller to the effect that filling stations that sold only automobile accessories in addition to petroleum products were not stores within the meaning of the Act, and therefore not subject to the tax. The Comptroller followed this opinion and made no effort to collect the tax from filling station operators until 1938, when the Attorney General's department overruled its earlier opinion.

In view of our above conclusion that the decision in the Standard case is based upon the holding that the language of the exclusion in question is clear and unambiguous, departmental construction is unimportant. As stated in Judge Critz's opinion in McCallum v. Associated Retail Credit Men, Tex.Com.App., 41 S.W.2d 45, 47: "The rule that a departmental ruling adhered to through years of administering of a statute will be given weight, only applies to statutes of doubtful construction. Such a rule has no application to a statute, such as this, that is not of doubtful construction or application. Ramsey v. Tod, 95 Tex. 614, 626, 69 S.W. 133, 136, 93 Am.St.Rep. 875."

See, also, Railroad Commission v. Red Arrow Freight Lines, Tex.Civ.App., 96 S.W.2d 735, error refused.

■ The 1941 amendment to § 5 of the Act, H.B. 8, Chap. 184, Art. XIX, § 1, p. 336, Gen.Laws 47th Leg., Vernon's Ann. P.C. art. 1111d, § 5, passed at the first session after the Eastland Court's decision was rendered, substitutes for the exclusion here in question: "any place of business commonly known as a gasoline filling station, service station, or gasoline bulk station or plant, provided as much as seventy-five (75) per cent of the gross proceeds of the business done thereat is derived from the selling, storing, or distributing of petroleum products." The amendment expressly provides that "The passage of this Act shall not change, alter, or modify the liability of any person * * * for the payment of license fees, including the interest and penalty due thereon, that are now due and owing the state," etc. It is of course apparent that the legislature intended by this amendment to make the exclusion operative as to filling stations not more than 25% of whose sales was of accessories. As to what the legislature may have thought regarding the proper construction of the original Act we have no certain means of knowing; nor is it of consequence in determining the issues be-

fore us. This amendment was passed after the Supreme Court had refused a writ of error in the Standard case, and thereby set its approval on the Eastland Court's construction of the Act. No subsequent legislative expression of its views regarding the intention of a prior session of the legislature could in any way affect the authority of the Supreme Court's previous adjudication upon that subject.

A re-examination of the question of the proper construction of the statute in the light of the several contentions of the Humble above discussed, or otherwise, is a matter which lies within the province of the Supreme Court alone.

Humble's fourth point reads: "The Chain Store Tax Act, as interpreted and applied by the Trial Court, is unconstitutional and void because it destroys a legitimate and useful business."

Under this point the petition alleged that Humble's net profits from its filling stations for the years 1936–1940 amounted to only $1,090,733.67. The total tax for those years amounted to $827,737.50. This left a net profit of $262,995.97. It alleged that it had a $6,000,000 investment in its filling stations; that it could not do business upon this margin of profit, but would have to go out of the filling station business and thus lose the value of its investment, if compelled to pay the tax. This is the substance of the petition in this regard.

We think these allegations, in so far as they are factual, fall short of showing the Act confiscatory within the meaning of the due process clauses of the State or Federal Constitutions. Vernon's Ann.St.Const. art. 1, § 19; U.S.C.A. Const.Amend. 14. The most they show is a very heavy burden of taxation and a great reduction in the net profits which would otherwise result.

The constitutionality of the Act generally was upheld, as against the contention that it violated the due process clause of the State Constitution, in the Chain Store Tax Cases (Hurt v. Cooper), 130 Tex. 433, 110 S.W.2d 896. Specifically, it was there held that the Act was primarily a revenue and not a regulatory measure, and its validity should be tested accordingly.

In the Fox case above the validity of chain store tax legislation as applied to filling stations was considered from almost every conceivable angle; and the Act there under consideration (not essentially different in these respects from the Act here involved and clearly equally as, if not in fact more, burdensome) was held valid.

Upon the specific decision that the rates were not so oppressive as to amount to "unlawful confiscation," the following holdings of the opinion by Mr. Associate Justice Cardozo are gleaned from the syllabus:

1. The fact that the fees are so large as to render unprofitable the operation of some of the units of the chain does not deny to such owner the equal protection of the law. (In the instant case it is not even alleged that any of the stations could not be operated at a profit; the allegation being only to the effect that the entire net profits from all stations for five of the six years amounted to only $262,995.97.)

2. When the power to tax exists, the extent of the burden is a matter of legislative discretion, unless it appears (as was held not the case there) that the Act is so arbitrary as not to be an exercise of the taxing power at all, but a cloak for something else.

3. Equal protection of the law is not violated in chain store graduated taxation, even though the tax may be so heavy as to discourage multiplication of units to an extent believed to be inordinate, and by the incidence of the burden to develop other forms of industry.

4. Collateral purposes or motives of the legislature in levying a tax of a kind within the reach of its lawful powers are matters beyond the scope of judicial review.

These are the holdings of the highest court in the land upon a question of the infringement of the constitutional guaranty of due process of law as applied to a fact situation which we do not find essentially different from that at bar; and we believe they effectually answer the contentions of the Humble in this regard.

Under its fourth point the Humble strongly relies upon American Alliance Ins. Co. v. Board of Ins. Com'rs, Tex.Civ.App., 126 S.W.2d 741, error refused, asserting that: "The holding of this Honorable Court was predicated entirely upon the proposition that a taxpayer is entitled to a reasonable return on his investment and that a tax structure or rate structure which will deny him such a return is void because it violates Section 19 of Article I of the State Constitution." There is nothing in the opinion in that case which could be construed as a holding that a tax structure would be invalid because it denied to the

taxpayer a reasonable return on his investment. The tax there was held invalid because of the express statutory provision that it must not be taken into consideration by the Insurance Board in fixing reasonable insurance rates. When the State exercises its rate-making powers, the rates it prescribes must be reasonable; and to be so they must allow a reasonable net return on the investment. The levying of the tax on the fire insurance business, and prescribing that it must not be taken into consideration in fixing reasonable rates, necessarily denied the power to fix rates reasonable to those engaged in the business to the extent of the amount of the tax. That case presents no analogy to that presented here where the State makes no attempt to regulate the charges for filling station products or services. The distinction between the two cases is vital and controlling.

The judgment of trial court is affirmed.