**WESTERN CO. et al. v. SHEPPARD et al.**

No. 9440.

Court of Civil Appeals of Texas. Austin.

May 31, 1944.

Rehearing Granted in Part and in Part

Overruled June 14, 1944.

Herbert Marshall, of Dallas, and L. D. Hawkins, of Breckenridge, for appellants.

Grover Sellers, Atty. Gen., Thos. B. Duggan and R. Dean Moorhead, Asst. Attys. Gen., for appellees.

J. H. Hart, of Austin, amicus curiæ.

BAUGH, Justice.

Appellants, the Western Company, a partnership, composed of Robert L. Wood and H. E. Chiles, Jr., W. H. Blair, individually, the Chemical Process Company, a Texas corporation, and the Independent-Eastern Torpedo Company, an Ohio cor-

poration, as plaintiffs, sued the Comptroller, the State Treasurer, and the Attorney General of Texas to recover occupation taxes theretofore paid by them under protest, and collected under the provisions of Acts 1941, 47th Leg., p. 269, Ch. 184, Art. XVI, Vernon's Texas Civil Stats. Art. 7060a. They sought to have said Act declared unconstitutional because in violation of Art. VIII, Sec. 1, of the Constitution of Texas, Vernon's Ann.St., and on the further ground that said Act was invalid because too vague, indefinite and uncertain; but if valid, then that the court enter a declaratory judgment setting forth the proper formula for computing and calculating the taxes due under said Act. Trial was to a jury, but at the close of the evidence, the jury was dismissed, and the court entered a judgment denying appellants recovery of the taxes paid by them, sustaining the validity of the Act, and setting forth a formula for guidance in calculating the tax; hence this appeal. The defendants below cross-assign error as to the declaratory portion of the trial court's judgment.

Appellants present 18 points which may be condensed into the following main contentions:

1. That the tax levied is an occupation tax. As to this there is no controversy and it need not be further considered.

2. That the occupation taxed by the Act, both in the language of the Act itself, and in the manner in which conducted by appellants, is a "mechanical pursuit" within the meaning of Art. VIII, Sec. 1, of the Constitution of Texas, and the tax against it is prohibited by the Constitution.

3. That being inhibited by the Constitution against individuals engaged in such mechanical pursuit, to hold it valid against the corporate appellants would also violate the provisions of Art. VIII, Sec. 2, of the Constitution of Texas requiring that occupation taxes be equal and uniform upon the same class of subjects.

4. That the Act is unconstitutional because too vague, indefinite and uncertain in that it does not adequately define the terms service furnished and duty performed, nor adequately fix and show the thing to be taxed, nor the manner of ascertainment of such tax.

5. That the statute is void because it makes no distinction between intrastate and interstate commerce, nor does it ap-

portion the tax as between these two types of commerce.

6. That whether or not the shooting or acidizing of wells were mechanical pursuits were fact issues which should have been submitted to the jury.

7. That the declaratory judgment does not authorize the deduction of sufficient items of expense incurred by appellants in computing the tax on the service furnished and duty performed.

Sec. 1(b) of the Act provides: "Every person in this State engaged in the business of furnishing any service or performing any duty for others for a consideration or compensation, with the use of any devices, tools, instruments or equipment, electrical, mechanical, or otherwise, or by means of any chemical, electrical, or mechanical process when such service is performed in connection with the cementing of the casing seat of any oil or gas well or the shooting or acidizing the formations of such wells or the surveying or testing of the sands or other formations of the earth in any such oil or gas wells, shall report on the 20th of each month and pay to the Comptroller, at his office in Austin, Texas, an occupation tax equal to two and two-tenths (2.2) per cent of the gross amount received from said service furnished or duty performed, during the calendar month next preceding."

Sec. 1(a) of the Act provides that the term "person" shall include individuals, partnerships, firms, associations, joint stock companies and corporations.

All the appellants are engaged in the business or occupation of shooting or acidizing oil wells. With only minor variations all of them use substantially the same methods, materials and equipment, and apply the same principles of operation. Acidizing of such wells is a distinctly different process from that of shooting the formations thereof with explosives.

So far as we have been able to ascertain, the constitutions of only two states expressly inhibit the levy of an occupation tax upon those engaged in mechanical pursuits, —Texas and Louisiana. This provision occurs in all constitutions adopted in Texas and has remained unchanged since the 1876 adoption. Only two cases appear to have arisen under this provision in Texas, —Mullinix v. State, 42 Tex.Cr.R. 526, 60 S.W. 768, wherein the Court of Criminal Appeals held that a photographer was not

engaged in a mechanical pursuit; and Jackson v. State, 55 Tex.Cr.R. 557, 117 S.W. 818, wherein the same court held that a barber was so engaged. In the latter case the Texas court quoted and followed the holding of the Supreme Court of Louisiana State v. Hirn, 46 La.Ann. 1443, 16 So. 403, in applying a similar provision of the constitution of that State.

▉ The question as to what constitutes a mechanical pursuit has been frequently before the Supreme Court of Louisiana. Other than the Texas cases above cited and one from Georgia, all decisions directly on the question appear to have been rendered by the Louisiana courts. See Words & Phrases, Perm.Ed., Vol. 26, p. 926; State v. Tung, 183 La. 281, 163 So. 101, 100 A.L.R. 1030, and annotations thereunder. The mere fact that mechanical tools, or the service of a mechanic, are utilized or employed in the performance of the ultimate service involved or in carrying on the business or vocation in question is not of itself determinative of the proper classification thereof. The business and services here involved are of comparatively recent origin and development; and obviously not known to the framers of the Constitution in 1876. This, however, does not prevent the application of the terms used as then intended to new and changed conditions if such new and changed conditions come within the purpose, meaning and intent of the framers of the Constitution. Travelers Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.2d 1007, 96 A.L.R. 802.

In State v. Cohn, 184 La. 53, 165 So. 449, 451, wherein the Supreme Court of Louisiana held that a "beauty specialist" was not engaged in a mechanical pursuit, the court reaffirmed a former test laid down by it in the following language:

"The term 'mechanical' is employed to indicate that the business, calling, or occupation in view must be one which cannot be utilized unless resort is had to the use of some machinery, or instrument of force, or appliance of power, in aid of manual·work, in some physical undertaking, in which the intervention or interaction of a superior mind is not required; in other words, the expression means that the occupation must be one by which the object realized is not dependent for its confection on the exertion of a controlling intellect, but rather on the adaptation of some helping mechanism, or use of some auxiliary tool or instrument. * * *

"A useful or mechanical art is that in which the hands and body are more concerned than the brain. * * *"

After a review of numerous cases the court then restated the rule as follows: "The test as stated by the foregoing definitions and authorities is whether or not the intellectual quality predominates over manual skill in performing the duties of the particular calling. If the mental aspect is controlling, then the pursuit is classified as a profession. If skill in the manipulation of the hands, tools, and machinery is emphasized over the mental side, then the calling is classified as a mechanical pursuit."

We believe this to be a sound and reasonable test and one that should be applied in the instant case.

In a letter to the Comptroller, dated May 7, 1943, G. R. Whitney, vice president of appellant, the Chemical Process Company, described the process of acidizing oil wells, engaged in by his company, as follows:

"In drilling a well to the depths commonly drilled by the oil operators today, the drill bit penetrates many different strata or layers of earth composed of many different geological formations. It is the practice of the oil well driller to obtain samples of each of these different formations penetrated by the drill bit. Before acidizing the well we secure these samples and make a detailed laboratory analysis of them to determine whether or not each particular stratum or layer is an oil bearing formation and, if so, to determine whether or not it is susceptible to an acid treatment and, if so, to determine the porosity and permeability and oil saturation content. It is by means of this analysis that a determination is made as to the quantity of acid required in that particular well to obtain the largest possible increase in production. This analysis also determines the method one should use in treating the particular well, whether a fast treatment or a slow treatment should be made, or whether there is danger of treating the well into water and, if so, whether to plug back the well to avoid water or to place a blanket in the bottom of the hole so as to keep the acid away from the water section.

"After a well has been treated, we study the results obtained in the first treatment. Frequently, we find that this treatment resulted in what is called a high gas-oil ratio well. indicating that too much of the acid injected penetrated the gas producing zone. We then make recommendations as to the advisibility of setting a packer between the gas zone and the oil zone and giving the well another treatment into the oil zone. If this treatment results in increasing the flow of oil to the extent that the gas-oil ratio is then satisfactory, all well and good. ·If, on the other hand, the gas-oil ratio still remains high, we then recommend a squeeze cement job in the gas zone. A like procedure is indicated where a high water-oil ratio exists.

"Selective acidizing is the latest development in the art of acid treating. Many wells are completed where the production is coming from two or more producing horizons. It is necessary to separate these various pay zones by the use of a mechanical packer and each zone is given an acid treatment separate and apart from the other zones.

"In studying each well to determine the adaptability of acid and to determine the proper treatment to make, an analysis of the grade of oil encountered is necessary for the reason that some of the heavier grades of oil, particularly, those with a high sulphur content, cause a very thick emulsion when the oil is mixed with the acid in the course of treatment. It is advisable, therefore, in treating a well producing this type of crude oil to use an emulsion breaking compound in conjunction with the acid treatment."

H. E. Chiles, Jr., one of the partners of the Western Company, testified that he was a graduate petroleum engineer; that his firm maintained a staff of about 25 employees, including truck drivers, mechanics, treaters, a geologist, a draftsman, and office employees. He testified that their chief business was sale of the acid to the owner of the well, who determined the amount to be used, what strata or formation should be acidized, and that, as a part of such sale, shipment by rail to the nearest shipping point, transfer there to trucks of appellant, and then placing same in the wells, was necessary to complete the sale. On cross-examination he stated that the mixture of alcohols, ammonia bifluoride and other chemicals with the muriatic acid was necessary; and that specially constructed trucks, pumps, connections, and other equipment were used. He also admitted that when requested by the well owner, his company made tests of the formations drilled,

recommendations as to the quantities and mixtures of acid to be used, what strata should be treated and used the necessary means, materials and equipment to confine the acidization to the proper strata. The processes and mixtures used were not uniform for all wells, but were affected by the character of the formation, the oil-gas ratio, the oil-water ratio, and other underground factors. In its published price list, the Western Company advertized "Experienced and technically trained crews. Latest and Finest Mechanical Equipment. Licensed to operate under all leading acidizing patents. Specialized Service. Engineered Acidizing. Treatments Tailormade for each well." The exhibits introduced in evidence, and the testimony relating thereto, also show that in acidizing a well there is used specially constructed trucks with power takeoff; compressors, pressure gauges, specially designed engines, various types of valves, unions, hose connections, pulleys, tools, etc.

Only the appellants W. H. Blair and the Independent-Eastern Torpedo Company are engaged in the business of shooting wells with explosives. T. B. Smith, shooter for the Torpedo Company, described the process as follows: "At the time when we first drive up on a location, usually on a liquid nitroglycerine shot we test the shells to make sure there is no leak. Then we measure the depth of the well to see that it is the depth the owner says it is. He knows how deep it is supposed to be and we will see whether or not that is the right depth. After measuring we will put a flag on the torpedo line, by using a cage as a weight to drag the torpedo down and on occasion we will run a dummy shell in place of the weight to make sure the actual shell will go. After the preliminaries are over we will load the shells with either the liquid or solidified nitroglycerine and lower them to the bottom of the hole. On the run, if it is pamp shot or a time bomb is asked for or required, we will run the time bomb set for the stated number of hours they wish to work before the shot goes off depending on the amount of work or pamping they want on top of the shot. If it is an open shot we will go ahead and make a jack squib and light and drop it, or it is a rare occasion any more, but it used to be we would run a line squib or pumper squib to detonate the shot. On top of the bomb there is an umbrella hung to keep sand and gravel from going into the shells and to confine the pamping to the top of the shot itself which is to hold the shot down and confine its force laterally instead of vertically. I believe that will cover roughly the entire procedure."

In enumerating the equipment used in the shooting process, the witness named and described such equipment as reels, centrifugal pump, cogwheels, chains, transmission take-off, pressure gauge, torpedo line, measuring meters, hook, pulley, derrick line, galvonometer, bomb testing outfit, jack squib, line squib, casing squib, electric squib, bumper squib, a "whole box full of hand tools," the use of sand, peagravel, chap or cal-seal, cog catches, safety latches, etc.

While the witnesses testified that in practically every instance the decision as to when a well should be shot, in what formation, and the quantity of explosives to be used was made by the well owner; and that the appellants merely followed his instructions; the hazardous nature of the process, the necessary safety precautions, the uses of the special equipment, and the materials required, demonstrate beyond doubt, we think that such process requires special training, scientific knowledge, expert skill, and extreme precaution for the safety of lives, equipment and property in performing such service, and obviously called for the "exertion of a controlling intellect" in the use of a mechanical means involved,—one wherein the "intellectual quality predominates over the manual skill in performing the duties of the particular calling," and this is true both as to the acidizing and the shooting of oil wells.

■ In an amicus curiae brief it is urged that since the statute expressly provides that the occupation taxed is that performed "with the use of any devices, tools, instruments or equipment," etc. in and of itself it is limited to the use of such devices, tools, etc., and is, therefore, by its terms limited to a mechanical pursuit. That is, that the use of the devices, tools, etc., prescribed is a limitation upon the tax imposed, confining it to the use of the stated methods of pursuing the designated occupation. With this we do not agree. The statute levies the tax on any person, whether individual, partnership, or corporate "engaged in the business of furnishing any service or performing any duty * * * in connection with the cementing of the casing seat of any oil or gas well or the shooting or acidizing the formations of such wells * * *." The

856

methods stated by the use of which the occupation was conducted appear rather to be for the purpose of defining and making specific the particular occupation taxed rather than as a limitation upon the manner in which the occupation is pursued. This is clearly indicated by the use, after indicating certain specific methods of carrying on such business, of the words "or otherwise."

The next contention is predicated on the assumption that individuals engaged in such business are carrying on a mechanical pursuit and are therefore exempted by the Constitution from such a tax; and that to tax a corporation engaged in the same business would be discriminatory, contravene the State constitutional provision that such taxes "shall be equal and uniform upon the same class of subjects" (Art. VIII, Secs. 1 and 2); as well as contravene the equal protection clause of the Federal Constitution, Amend. 14. We are so fully convinced, however, that the occupation so taxed, in the light of the evidence as to how it is carried on by all of the appellants, is not a mechanical pursuit, that we do not deem it necessary to discuss the question as to whether it would, under the holdings of the Supreme Court of Louisiana and of the Federal District Court in White Cleaners & Dyers v. Hughes, 7 F.Supp. 1017, 1018, be valid against the appellant corporations even though invalid against an individual pursuing such occupation. If, as we conclude, none of the appellants are engaged in a purely mechanical pursuit, as contemplated by the language of the Constitution, consideration of this issue becomes unnecessary.

Shortly after the Act became effective the Attorney General rendered an opinion, by which the Comptroller was guided, to the effect that the tax due on the service furnished or duty performed should be measured by the gross amount received less the cost of the materials used. Thereafter there were continuous differences between appellants and the Comptroller as to what items should be deducted as a part of the costs of the materials. Upon the trial, the Attorney General withdrew his opinion and took the view that no deductions should be allowed, but that the entire gross receipts were subject to the tax. Appellants urge that these facts and circumstances in themselves show that the Comptroller could not interpret the law,

and that the Act is so vague and indefinite as to render it invalid. This contention is not sustained. The words service and duty are words of common usage and generally well understood. The fact that their application to a particular set of facts or a particular occupation may be somewhat difficult does not render the language of the Act indefinite or uncertain. Either the tax was intended to apply to the gross receipts of the entire process of shooting or acidizing wells, including the costs of materials; or it was intended to be limited to the gross receipts from the services performed in the actual acidizing or shooting of the well, exclusive of the cost of the acid or explosives used in such processes. It must be presumed that the Legislature, when it passed the act, was familiar with the manner in which such business was conducted. The record discloses that in the acidizing process large quantities of acid are used, the amounts and mixtures dependent upon the character and thickness of the oil bearing strata; and that the appellants so engaged were more interested in the sale of the acid than in placing it in the well. There are thus involved in the business of such appellants two factors,— one a sale of the acid; and the other a service of placing same in the well in such manner, by the use of their own equipment, skill, etc., as to accomplish the desired result. The major portion of the gross receipts for the overall undertaking was for the materials furnished and used; and the charge for "servicing" the well with such materials constituted only a minor portion of the total aggregate or gross charge, though the two items were not specifically segregated in such overall or gross charge. If the Legislature, cognizant of these matters, had intended to levy the tax both on the cost of the materials used in performing such service and on the service performed in acidizing the well, it could easily have so provided. Since, however, the language used emphasizes the term service in connection with the shooting or acidizing process, an item separable from the sale and delivery of the materials used, which could have been made a distinct transaction without such service; and lays the tax by express language on the "service furnished or duty performed," the gross receipts taxed would, we think, be those received for such services, not including the value of the materials used. Such was the interpretation originally placed on the Act by the Attorney General

and by the Comptroller, and by the trial court, and was, we think, a proper one.

Where a transaction involves both a sale and a service, under sales tax laws, questions have arisen as to how such transaction should be classified. These matters were considered in connection with the chain store tax in Humble Oil & Ref. Co. v. State, Tex.Civ.App., 158 S.W.2d 336, and in Central Power & Light Co. v. State, Tex.Civ.App., 165 S.W.2d 920, wherein we held that the sale, in the one instance, of automobile accessories in connection with the servicing of automobiles; and, in the other, the sale of electrical equipment in connection with the furnishing of electrical service, though only incidental to the main business of the vendors, brought such installations within the meaning of the terms, store or mercantile establishment, as used in the Chain Store Tax Law, Vernon's Ann. P.C. art. 1111d, for licensing purposes.

 In such cases the classification of the transaction as a sale or a service should ordinarily be determined by the dominant factors involved. If the value of the property or materials furnished to the well owner and paid for by him is the dominant and paramount factor in the gross charge; and the service rendered in connection with same after delivery at the well head is only incident thereto, then the transaction generally should be regarded as a sale. On the other hand, if the service involved after the materials reach the well head is the dominant and most important factor in the the transaction and the value of the materials used is only incident thereto and constitutes only a minor part of the gross charge, then the transaction is dominantly a service and should be so classed. The record shows that in the acidizing process the prime concern of the appellants so engaged is in the sale of the acid; and that in the gross charge, for both the sale and the service rendered in placing same in the well the service charge was generally estimated at approximately $70 per well, though not segregated from the gross overall charge for both. While the trial court undertook in its judgment to prescribe a formula for arriving at the value of the service, it seems impracticable to lay down a fixed formula in detail which would apply in all instances. No good reason appears why those so engaged in such business could not and should not segregate in each instance a fixed charge for such service from the sales price of their materials at

the well head. In the absence of such segregation and the fixation of a specific service charge, since the statute expressly taxes only the service, regardless of the dominant element of value of the materials used, the most reasonable and practical method of arriving at the service charge would be the difference between the fair and reasonable market value of the acid delivered at the well head and the total gross charge; or if such market value cannot be so established, then its actual or intrinsic value at the well head. In determining such market or actual value all of the elements entering into same should be considered, not only those undertaken to be enumerated in the trial court's formula, but any others fairly and reasonably entering into the value, whether market or actual, of the materials used in the shooting or acidizing process delivered at the well head. These elements should include such items as original cost of materials, cost of transportation, insurance, demurrage, evaporation, wear and tear on equipment, pro rata cost of overhead, a reasonable profit on the sale, and any other reasonable or necessary element of cost entering into the value of such materials delivered at the well head ready to be used in the acidizing process.

While shooting a well with explosives involves a greater degree of skill, greater hazards, more precaution and safeguards against the dangers involved than does the acidizing process; considered as a whole, no valid reason appears for a different classification of that process from that applied to acidizing; nor for the application of a different rule in determining the gross receipts for the service involved. As in the case of acidizing, a separate service charge could easily be fixed either on a percentage basis of the gross charge or on the basis of quantity of explosives used. The record does not show the value of the explosives used. Such explosives consisted of nitroglycerine, both liquid and solidified, and dynamite, the latter used chiefly for detonating the nitroglycerine. Appellant Blair had no employees and did the entire shooting process himself. Apparently his business was confined chiefly to small shots. He testified that his average charge per well was from $150 to $200, though he did not state what quantities of explosives he used. T. B. Smith, shooter for the Independent-Eastern Torpedo Company, testified that the average well varied from 300 to 1,500 quarts of liquid nitro-

glycerine and from 400 to 500 quarts of solidified nitroglycerine, and required the use of from 20 to 100 pounds of dynamite. The average time required to shoot a well, after arrival on the premises, was from 4 to 7 hours, unless the use of a time bomb was directed by the well owner, in which case an additional charge of from $77 to $150 was made. The charge made for the entire process was "according to the size of the shot." The well owner determined the quantity of explosives to be used. The price list published by the Torpedo Company shows a minimum charge of $60 for 5 quarts of liquid nitroglycerine, $250 for 100 quarts, and all in excess of 100 quarts $1.75 per quart, with an extra charge of $40 per day on all trips to wells requiring more than one day's drive to the well. Obviously, on small shots a great portion of the charge was for the service. From the published price list, however, it may be reasonably assumed that approximately $1.50 per quart is a fair value of the explosive used. On an average sized shot of 800 quarts, the published charge would be $1,475, of which $1,200 would be the value of the explosives used computed at $1.50 per quart, a dominant portion of the gross charge. We conclude, therefore, that the same method of arriving at the value of the service should be applied in shooting a well as in acidizing.

The contention that the Act is void for failure to distinguish between interstate and intrastate commerce is not sustained. The Western Company had been paying the tax on its operations in New Mexico, which constituted only a small percentage of its total business. Some acid was transported from Seagraves in Texas across the New Mexico line and wells acidized in that State. Taxes on the New Mexico operation, however, were not demanded by the Comptroller, but were paid voluntarily by said company under its own interpretation of the law. A witness for the Independent-Eastern Torpedo Company testified that it "sometimes happens" that wells are acidized by his company in one state with acid bought from another state. No instances were given however.

Under our conclusion that only the service performed at the well is subject to the tax, and not the value of the materials, the effect of such tax on such interstate movement of the materials used would be at most purely incidental. While the Act could well have been limited only to the services performed in this State, the language applying it to all persons in this State engaged in rendering such services can reasonably be interpreted as intending to apply only to services performed in this State. Such was the interpretation placed upon it by the Comptroller. As so interpreted in no wise places any burden on interstate commerce (conceding that some of the business of the named appellants may involve such commerce) and is clearly a valid enactment. It would, we think, be a strained construction to say that the Legislature undertook to tax a service performed in another state, a matter beyond its power to do. Even if open to two such constructions, that which gives it validity rather than one which strikes it down, should be applied. City of Waco v. Landingham, 138 Tex. 156, 157 S.W.2d 631, and authorities therein cited.

Not only did the appellants fail to make any objection to the discharge of the jury, or to request the submission of any issue of fact to the jury, the issue of whether the acidizing or shooting of wells, under all the facts and circumstances, constituted a "mechanical pursuit" as that term is used in the Constitution, was clearly a question of law for the court and not one of fact for jury determination.

What we have said above disposes of appellees' cross-assignment urging that under said Act no deductions from gross receipts are authorized in computing the tax. That portion of the trial court's declaratory judgment, setting forth a formula for computing the tax, is modified so as to authorize deductions from the overall or gross charge for both materials and services, the fair market value of the materials used delivered at the wells; or if such market value cannot be reasonably ascertained, then deduction from such gross charge of the fair actual or intrinsic value of such materials used in the acidizing or shooting of such wells. As thus modified, the judgment of the trial court is affirmed.

Modified and affirmed.

On Appellants' Motions for Rehearing.

Appellants in their motions for rehearing urge, among other things, that the case should be reversed and remanded instead of affirmed, for the reason that the formula for computing the amount of the tax due, laid down by this court, differs from that used by the Comptroller in com-

puting and collecting the taxes involved; and that the case was not fully developed on the trial to show the correct amount of such taxes legally due by them under the formula adopted by this court. In this they are correct. Having sued, among other things, to recover the taxes paid by them under protest, they would be entitled to recover any portion thereof so paid by them in excess of what they were legally required to pay. Said motions are therefore granted to that extent. The judgment of this court affirming the judgment of the trial court is therefore set aside and the cause is reversed and remanded to the trial court to determine what amount, if any, of the taxes heretofore paid by appellants under protest they may show themselves entitled to recover. In all other respects said motions are overruled.

Granted in part and in part overruled.