

# THE ATTORNEY GENERAL
## OF TEXAS
### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

*affirmed by*
*V-1567*

November 20, 1951

Hon. Robert S. Calvert
Comptroller of Public Accounts
Austin, Texas

Dear Mr. Calvert:

Opinion No. V-1353

Re: Construction of Subsection
(b), Section 1, Article 7060a,
V.C.S., relating to the tax-
ation of certain oil well sur-
veying or testing services.

You have asked this office for a construction of Arti-
cle 7060a, V.C.S., with reference to the taxability of certain well
servicing operations. Your request embodies several questions
which we will briefly state and answer separately.

Subsection (b) of Section 1 of Article 7060a, as amend-
ed by Section XIV of House Bill 285, Acts 52nd Leg., R.S. 1951, ch.
402, p. 695, reads as follows:

"(b) Every person in this State engaged in the
business of furnishing any service or performing any
duty for others for a consideration or compensation,
with the use of any devices, tools, instruments or
equipment, electrical, mechanical, or otherwise, or
by means of any chemical, electrical or mechanical
process when such service is performed in connection
with the cementing of the casing seat of any oil or gas
well or the shooting or acidizing the formation of such
wells or the surveying or testing of the sands or other
formations of the earth in any such oil or gas wells,
shall report on the 20th day of each month and pay to
the Comptroller, at his office in Austin, Texas, an oc-
cupation tax equal to 2.42% of the gross amount re-
ceived from said service furnished or duty performed,
during the calendar month next preceding. The said
report shall be executed under oath on a form pre-
scribed and furnished by the Comptroller."

This office has held in previous opinions that the tax
in question applies only to well services which are performed in
connection with the following specifically named operations: Ce-
menting of the casing seat of any oil or gas well, shooting or acid-
izing the formations, and the surveying or testing of sands or for-
mations of the earth in such wells. Att'y Gen. Ops. O-3627 (1941),
O-3698 (1941), O-3784 (1941), and O-4261 (1942).

In your first question you ask if the opinions of this office construing Article 7060a are still in effect in view of the decision of the Court of Civil Appeals in Western Co. v. Sheppard, 181 S.W.2d 850 (Tex, Civ. App, 1944, error ref.).

The plaintiffs in the Western Company case sued to recover taxes which had been paid under protest on receipts from shooting and acidizing oil and gas wells, The plaintiff contended that various items of expense incurred in performing such services were deductible from the gross receipts before computing the tax. In this connection, the Court said:

"The words service and duty are words of common usage and generally well understood. The fact that their application to a particular set of facts or a particular occupation may be somewhat difficult does not render the language of the Act indefinite or uncertain. Either the tax was intended to apply to the gross receipts of the entire process of shooting or acidizing wells, including the costs of materials; or it was intended to be limited to the gross receipts from the services performed in the actual acidizing or shooting of the well, exclusive of the cost of the acid or explosives used in such processes. It must be presumed that the Legislature, when it passed the act, was familiar with the manner in which such business was conducted. The record discloses that in the acidizing process large quantities of acid are used, the amounts and mixtures dependent upon the character and thickness of the oil bearing strata; and that the appellants so engaged were more interested in the sale of the acid than in placing it in the well. There are thus involved in the business of such appellants two factors,--one a sale of the acid; and the other a service of placing same in the well in such manner, by the use of their own equipment, skill, etc., as to accomplish the desired result. The major portion of the gross receipts for the overall undertaking was for the materials furnished and used; and the charge for 'servicing' the well with such materials constituted only a minor portion of the total aggregate or gross charge, though the two items were not specifically segregated in such overall or gross charge, If the Legislature, cognizant of these matters, had intended to levy the tax both on the cost of the materials used in performing such service and on the service performed in acidizing the well, it could easily have so provided. Since, however, the language used emphasizes the term service in connection with the shooting or acidizing process, an item separable

from the sale and delivery of the materials used, which could have been made a distinct transaction without such service; and lays the tax by express language on the 'service furnished or duty performed,' the gross receipts taxed would, we think, be those received for such services, not including the value of the materials used." (181 S.W.2d at 856.)

The Court then set out the following guide or rule to be used in arriving at the value of materials sold and delivered to the well head:

"No good reason appears why those so engaged in such business could not and should not segregate in each instance a fixed charge for such service from the sales price of their materials at the well head. In the absence of such segregation and the fixation of a specific service charge, since the statute expressly taxes only the service, regardless of the dominant element of value of the materials used, the most reasonable and practical method of arriving at the service charge would be the difference between the fair and reasonable market value of the acid delivered at the well head and the total gross charge; or if such market value cannot be so established, then its actual or intrinsic value at the well head. In determining such market or actual value all of the elements entering into same should be considered, not only those undertaken to be enumerated in the trial court's formula, but any others fairly and reasonably entering into the value, whether market or actual, of the materials used in the shooting or acidizing process delivered at the well head. These elements should include such items as original cost of materials, cost of transportation, insurance, demurrage, evaporation, wear and tear on equipment, pro rata cost of overhead, a reasonable profit on the sale, and any other reasonable or necessary element of cost entering into the value of such materials delivered at the well head ready to be used in the acidizing process." (181 S.W.2d at 857.)

Our answer to your first question is that, after reviewing the prior opinions of this office construing Article 7060a in the light of the Western Company case, we still adhere to the rulings and conclusions reached in those opinions.

In your second question you have asked if certain operations of Associated Engineers, Inc. and Hudson-Eads, Inc. are taxable under the prior rulings of this office.

In answering this question, we will briefly set out these operations and then state our conclusion as to the taxability of the service in question:

1. Temperature surveys made to locate the top of the cement behind the casing for the purpose of determining the success of the cementing. It is our opinion that this is taxable service performed in connection with the cementing of the casing seat. Att'y Gen. Op. O-3698 (1941); Uren, "Petroleum Production Engineering, Oil Field Development" (3rd Ed. 1946) 655.

2. Bottom hole pressure or depth pressure tests. These are technical services performed in connection with the surveying or testing of the sands or other formations of the earth and are taxable. Att'y Gen. Ops. O-3698 (1941) and O-4188 (1942); see Pirson, "Elements of Oil Reservoir Engineering" (1st Ed. 1950) 239.

3. (a) Productivity index test. This is a well test used to calculate the barrels of oil that can be produced per unit of time per pound of bottom hole pressure drop.

(b) Gas-oil ratio testing. This test may be generally defined as the measurement of the volume of the oil and gas produced from a well and the mathematical relationship of the one to the other.

(c) Bottom hole sampling or subsurface fluid sampling and analysis.

(d) Open flow potential tests. These tests have been defined in the brief attached to your request as that of "measuring the volume of gas produced from a well and determining the pressure in the well from actual measurements with a bottom hole pressure gauge or by calculation from pressures measured at the surface. With this data the theoretical volume which the well will produce is calculated for the hypothetical condition of zero pressure at the bottom of the well."

(e) Gas-condensate well tests. These tests are, according to the submitted brief, similar or equivalent to gas-oil ratio tests, fluid sampling, and open hold potential tests except that this test is applicable only to gas wells producing gas containing relatively large amounts of vaporized liquids.

It is our opinion that these services are all re-lated technical services performed within the scope of testing or surveying of sands or formations under the statute and are taxable services. Att'y Gen. Op. O-4188 (1942).

4. Tubing perforating. In Att'y Gen. Ops. O-3627 (1941) and O-3784 (1941) it was held that the op-eration of perforating the casing of a well did not come within the meaning of the term "shooting" and that such service was not included within the statute unless it was used in connection with one of the other named taxable operations. It is our opinion that the same rule would apply to the perforating of the tubing of a well.

5. Sand bailing, paraffin removal, cleaning out operations, and servicing of subsurface control equip-ment. These are mechanical operations which are not included within the scope of the statute and are not subject to the tax unless in some unusual instance they are performed in connection with one of the taxable operations. Att'y Gen. Op. O-3627 (1941).

Your third question concerns the taxability of certain operations and services performed by A-1 Bit & Tool Company, as shown in the invoices attached to your request. The principal items shown on these invoices are charges for making sidewall cores. We have in previous opinions held that both sidewall samp-ling or coring and core analysis are taxable operations. Att'y Gen. Ops. O-3698 (1941) and O-4188 (1942). See, also, Sheppard v. Rotary Engineering Co., 208 S.W.2d 656 (Tex. Civ. App., 1948).

The other items shown on the invoices include the cost of cutter heads, charges for service hours, and trucking charges. Such items do not represent the sale of a material un-der the decision of the Western Company case, supra, and cannot be segregated from the service charge. It is our opinion that these items are merely expenses of operation incurred in the cor-ing operations and should be included within the gross receipts from service operations.

In your fourth question you ask if royalty payments to persons owning patents on tools, instruments, and equipment used by persons engaged in well servicing operations are deductible from the receipts derived from such operations before computing the tax.

Article 7060a does not contain a definition of the term "gross amount" as used in the statute; therefore, we must look to general usage in order to ascertain the meaning of this term.

The term "gross amount" was construed in Fire Ass'n of Philadelphia v. Love, 101 Tex. 376, 108 S.W. 158, 160 (1908), as follows:

> "The word 'gross' is defined: 'Whole; entire; total; without deduction.' Webster's Dictionary; Scott v. Hartley, 126 Ind. 246, 25 N.E. 826. The language under consideration in the statute is: 'The gross amount of premiums received in the state.' There is no ambiguity in the language of the statute, and there can be no doubt as to what its ordinary meaning is. The rule governing the interpretation of such language is thus stated in Chambers v. Hill, 26 Tex. 472: 'Where language is plain and unambiguous, there is no room for construction. It is never admissible to resort to subtle and forced constructions to limit or extend the meaning of language. And, where words or expressions have acquired a definite meaning in law, they must be so expounded.' Under the rule of interpretation just quoted there is no room for construction of the language of the statute. It just simply means that the entire sum received by such insurance companies as premiums in this state should be the basis upon which to estimate the occupation tax required to be paid by such companies. . . . Therefore, taking the language of the entire provision into consideration, it means, as stated before, that the basis upon which the tax is to be assessed is 'the gross premium receipts,' the whole amount received, without deduction or abatement."

The term "gross amount" is defined in 38 C.J.S. 1083, note 87, as ordinarily meaning the "entire amount of the receipts of a business." The term "gross receipts" is defined in 38 C.J.S. 1082 as follows:

> "Ordinarily, the gross amount of cash received; but its construction and meaning depend on the context and the subject matter, and accordingly it may be construed to mean actual cash collected on particular obligations, together with moneys in hand due the obligors and credited on such indebtedness; the entire receipts without any deduction; 'gross sales', including the gross amount collected and uncollected of all the sales."

We are of the opinion that the terms "gross receipts" and "gross amount" have equivalent or synonymous meanings and that the term "gross amount" as used in Article 7060a includes the total gross receipts from the named taxable operations or services without any deduction for maintenance, insurance, royalty payments, salaries, or other operating expenses or costs of performing the particular service.

In your last question you have requested that we advise you as to whether acidizing of a well must be done immediately following the perforation of the casing in order for the perforating service to be considered as having been performed in connection with the acidizing. In Attorney General Opinion O-3627 (1941) we held that ordinarily the perforating of the casing of a well, by either a gun or mechanical means, did not come within the meaning of the term "shooting" as used in the statute; however, the perforating service was held to be taxable if performed in connection with one of the taxable operations.

In Attorney General Opinion O-3784 (1941), in construing the term "in connection with," we said:

"... an operation does not have to be one of the named operations to be taxable, but it is taxable if it is merely 'performed in connection with' one of the named operations. 'The courts have given the phrase "in connection with" a broad interpretation.' Kokusai Kisen Kabushiki Kaisha v. Columbia Stevedoring Co., 23 Fed. Supp. 403. We believe that any service that is performed as a necessary step toward the performance of, or in fulfillment of, a particular operation would be considered as being done 'in connection with' said particular operation."

It is our opinion that while the time element is very important, it is not the determining factor and it is therefore not necessary for the acidizing of a well to be performed immediately following the perforating of the well casing in order for such perforating to be performed in connection with the acidizing. The test to be applied is that of determining if the perforating was performed as a necessary step in preparation for acidizing the well. We are of the opinion that the purpose of the individual perforating operation must be considered and that as a consequence a rule or formula setting out a fixed period of time as a test could not be prescribed that would apply to all fact situations. In this connection, we would like to point out again that if a perforating operation is performed for the purpose of completing the gas or oil well, the fact that such perforations are subsequently used in acidizing the well would not make the perforating service taxable if there is no continuity or connection between the two operations.

## SUMMARY

Under the submitted facts the following operations are services performed in connection with one of the specifically named operations which are subject to the tax levied by Article 7060a, V.C.S.: temperature surveys made for the purpose of locating top of cement, bottom hole pressure or depth pressure tests, productivity index tests, gas-oil ratio tests, bottom hole sampling and analysis, open flow potential tests, gas-condensate well tests, sidewall sampling, and core analysis. Att'y Gen. Ops. O-3698 (1941) and O-4188 (1942). Tubing perforating, sand bailing, paraffin removal, and other cleaning out operations are mechanical operations not ordinarily performed in connection with one of the taxable operations. Att'y Gen. Ops. O-3627 (1941) and O-3783 (1941).

Article 7060a levies an occupation tax upon those persons engaged in the well servicing business measured by the gross amount received from such operations, less the cost of materials sold, but without any deductions for expenses, royalty payments, or other costs of performing the service.

Yours very truly,

PRICE DANIEL
Attorney General

By Frank Lake

Frank Lake
Assistant

APPROVED:

W. V. Geppert
Taxation Division

Jesse P. Luton, Jr.
Reviewing Assistant

Charles D. Mathews
First Assistant

FL/mwb