**CONLEN GRAIN AND MERCANTILE, INC.,
et al., Appellants,**

**v.**

**TEXAS GRAIN SORGHUM PRODUCERS
BOARD, Appellee.**

No. B–4711.

Supreme Court of Texas.

Jan. 15, 1975.

Rehearing Denied Jan. 26, 1975.

---

McGinnis, Lochridge & Kilgore, James W. Wilson, Austin, for appellants.

John W. Hill, Jr., Atty. Gen., Robert Gauss, Asst. Atty. Gen., Austin, George E. Gilkerson, Lubbock, Lemon, Close, Atkinson & Shearer, R. D. Lemon, Perryton, for appellee.

WALKER, Justice.

This is a direct appeal pursuant to Article 1738a.[1] Texas Grain Sorghum Producers Board, appellee, brought suit against Conlen Grain and Mercantile, Inc., appellant, to recover the amount of assessments which Conlen, as a "processor" of grain sorghum, was required to collect from grain sorghum producers and remit to the Board under the provisions of Article 55c, referred to by appellee as the Texas Commodity Referendum Act. J. E. Crabtree, the principal stockholder of Conlen and a grain sorghum producer, intervened and is also an appellant here. Conlen and Crabtree filed a counterclaim seeking a declaratory judgment that the statute is unconstitutional and a permanent injunction restraining the Board from collecting assessments. After a trial before the court without a jury, judgment was rendered: (1) that Conlen and Crabtree take nothing by their suit for declaratory and injunctive relief; and (2) awarding the Board judgment against Conlen for $4,644.02, stipulated to be the amount of the assessments Conlen should have collected and remitted if the statute is valid, plus interest and costs. In our opinion the statute is an unconstitutional attempt to impose an occupation tax on an agricultural pursuit.

The statute sets up a method whereby a nonprofit organization representing the producers of a particular agricultural commodity may petition the Commissioner of Agriculture for authority to conduct a referendum, either on an area or statewide basis, to determine whether the producers of the commodity shall "levy an assessment upon themselves to finance programs authorized by this Act." Upon being certified by the Commissioner, the petitioning organization conducts a referendum on the proposition of whether the producers "shall levy an assessment upon themselves, not to exceed a rate specified on the ballot, for the purposes stated in this Act" and an election of members to a commodity producers board for the particular commodity. If the proposition is approved by at least two-thirds of those voting in the election, or if those voting in favor of the proposition produced at least 50 percent of the volume production of the commodity during the last relevant production period, the board is established.

The board "is an agency of the state for all purposes" and is charged with the responsibility of formulating and administering programs for the purposes stated in the Act. It is empowered, among other things, to employ personnel, incur expenses to carry out the purposes of the Act, and set the rate of assessment at or below the latest maximum established by a vote of the producers. Assessments are collected by the processor, usually the first purchaser of the commodity for commercial purposes, by deducting the amount thereof from the purchase price. The money thus collected must be remitted by the processor to the board, which may expend the same as it considers proper for the purpose of "developing, carrying out, and participating in programs of research, disease and insect control, predator control, education, and promotion, designed to encourage the pro-

---

1. All statutes are referred to by the article number under which they appear in Vernon's Annotated Texas Civil Statutes.

duction, marketing, and use of the commodity upon which the assessment is levied."

Under the statute as originally enacted in 1967, participation in the program was strictly voluntary. The processor was authorized to collect assessments only from producers who signed participation certificates. A participating producer might withdraw at any time by signing an exemption certificate, and he might also obtain a refund of any assessment paid by making written application within 60 days. The statute was amended in 1969 to eliminate the use of participation and exemption certificates. Participation then became mandatory to the extent that processors were required to collect assessments from all producers in the area subject to the board's jurisdiction. The provision allowing any producer to obtain a refund of an assessment paid by him was retained, however, and language was added requiring the secretary of the board to make the refund not later than the 10th day of the month following the month in which the refund application and proof of payment are received.

Referenda and elections have been conducted since 1969 by producers of peanuts, grain sorghum, soybeans, turkeys, wheat, sheep and goats, pecans and swine. The sheep and goat raisers refused to adopt the program, but favorable votes resulted in the creation of commodity producer boards and the imposition of mandatory, although refundable, assessments with respect to the other commodities. The grain sorghum referendum was held on October 6, 1969, for an area embracing 29 counties in West Texas. Approximately half of the state's production of grain sorghum is produced in these 29 counties, which comprise the western half of the Panhandle. The referendum proposition was approved by 74.1 percent of those voting at the election, and the Texas Grain Sorghum Producers Board was established. An assessment of $.05 per ton on grain sorghum was immediately levied, and processors were noti-

fied to collect and remit the same to the Board. Conlen refused to comply, and this suit was instituted to recover the amounts that should have been collected and paid. The first amended original petition contains an allegation that Conlen had failed to remit certain amounts collected by it from producers, but we find nothing in the record to support that allegation.

Conlen and Crabtree contended in the trial court that the statute and the assessments thereunder violate several provisions of the Constitutions of the United States and of the State of Texas. They now have narrowed their contentions and say that the statute contravenes the following provisions of the Texas Constitution, Vernon's Ann.St.: (1) Article VIII, Section 1, in that the assessment is an occupation tax upon an agricultural pursuit; (2) Article VII, Section 3, in that it is an occupation tax and one-fourth of the revenue is not set aside for the benefit of the public free schools; (3) Article VIII, Section 1, in that the power to levy an occupation tax is delegated to a governmental agency not named in that section; and (4) Article VIII, Section 3, in that the assessment is a tax not levied by general law. Since the first of these attacks must be sustained, we do not consider the other three.

The parties agree that the statute as originally enacted in 1967 had no constitutional infirmities, because it did little more than establish a procedure by which producers of an agricultural commodity might voluntarily contribute to programs for their benefit. Appellants say that the 1969 amendments changed the voluntary contribution plan to one of mandatory taxation. The Board insists that the exaction is not a tax but a special assessment imposed as an incident of a reserved legislative power. It relies on cases such as City of Wichita Falls v. Williams, 119 Tex. 163, 26 S.W.2d 910, 79 A.L.R. 704; Higgins v. Bordages, 88 Tex. 458, 31 S.W. 52; and Roundtree v. Galveston, 42 Tex. 612.

■ Each of the cited cases involved a levy on land in the vicinity of a public im-

provement to pay the cost of the improvement and based on the special benefit the property was supposed to have derived therefrom. These are the characteristics of a special assessment, which is generally held not to be a "tax" as that term is ordinarily understood. See City of Houston v. Blackbird, Tex.Sup., 394 S.W.2d 159; 1 Cooley on Taxation, 4th ed. 1924, § 31; 70 Am.Jur.2d, Special or Local Assessments, § 1. Assessments made under Article 55c are not levied on land and do not purport to be based on benefits to property. They are not made as required to pay the cost of public improvements but are levied periodically to provide a fairly constant source of revenue that is expended by an agency of the state as it considers proper for the support of programs calculated to increase the production and use of particular agricultural commodities. These programs doubtless promote the economic welfare of many who are engaged in producing the commodities, but the assessment paid by any particular person is not necessarily related to the benefits that will be received by that person through the Board's expenditure of the money he paid. The levy is not a special assessment.

■ The Board also points out that the money: (1) is not paid into the State Treasury; (2) does not become a part of the general revenues of the State; (3) is not subject to appropriation by the Legislature; (4) can be levied only by a producer-elected board after adoption of the program by a two-thirds producer vote; and (5) is refundable at the option of the producer. It is clear that the first four of these reasons afford no basis for holding that the assessment is not a tax. In Harris County v. Shepperd, 156 Tex. 18, 291 S. W.2d 721, a local law that would have enabled Harris County to collect an additional automobile registration fee and use the funds to acquire highway right of way was held to violate the provision in Article VII, Section 3, of the Texas Constitution that taxes shall be levied and collected by general laws and for public purposes only. The money was not to be paid into the

State Treasury, was not to become a part of the State's general revenue, and was to be expended by the commissioners court. It was also provided that the law would not be operative until a majority of the resident property taxpayers of the county had voted to place it in operation. The additional registration fee was nevertheless held to be a tax.

■■ The refund option available to a producer who has paid the assessment presents a somewhat more difficult question, but we agree with appellants that the essential nature of the assessment is not altered thereby. A tax is a burden or charge imposed by the legislative power of the state upon persons or property to raise money for public purposes. See Clegg v. State, 42 Tex. 605; 1 Cooley on Taxation, 4th ed. 1924, § 1. When the state in the exercise of its power to raise revenue for public purposes exacts an enforced contribution of money to be expended by an agency of the state, the exaction must be regarded as a tax even though the taxpayer may obtain a refund upon request. Provision for refunding assessments to those who comply with refund requirements does not alter the fact that the payments are imposed upon and extracted from producers by governmental authority for a public purpose. The power of the state is used to deprive the producer of money, or the use of his money, for at least the time necessary to process an application for refund. It also appears that the primary purpose of the assessment is to raise revenue. We hold that assessments under Article 55c are taxes.

■ Once that conclusion is reached, it is clear that the assessment is an occupation tax within the meaning of Article VIII, Section 1, of the Texas Constitution. The Attorney General does not argue to the contrary. Our decision in Rouw Co. v. Texas Citrus Commission, 151 Tex. 182, 247 S.W.2d 231, involved a similar but nonrefundable tax imposed on those who packed and marketed or processed and sold citrus fruit grown in the state. The pur-

pose of the levy was to promote the citrus industry. In holding the statute unconstitutional, the Court reasoned:

Applying the above rule to the Act under consideration we find the tax levied to be an occupation tax. A reading of the Act clearly demonstrates that its primary purpose is to raise revenue, and not a regulation of the citrus fruit industry under the police power. Laudable as the purpose of the Act may be; viz. to advertise and enlarge the markets for Texas citrus fruit and its by-products, and for research beneficial to the citrus industry, the primary purpose being the raising of revenues in excess of the amount needed for regulation of the industry to carry out the above provisions, under the well established rules of law, the tax levied must of necessity be classed as an occupation tax. Being an occupation tax, it therefore comes within the plain requirements of the first sentence of Section 2, Article VIII of the Texas Constitution—that it be "equal and uniform upon the same class of subjects within the limits of the authority levying the tax".

■ An occupation tax is a form of excise tax imposed upon a person for the privilege of carrying on a business, trade or occupation. State v. Galveston, H. & S. A. R. Co., 100 Tex. 153, 97 S.W. 71 (reversed on the ground that the tax was a burden on interstate commerce, 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031); Pullman Palace Car Co. v. State, 64 Tex. 274. Under the terms of Article 55c the tax is imposed upon and collected from the producer who is "any person within this state engaged in the business of producing, or causing to be produced for commercial purposes, any agricultural commodity." The tax is collected at the "commodity process point" prescribed by the Board or in the statute, and its amount is determined by the quantity of grain that is processed

or handled in a commercial transaction. The subject of taxation is the businesss or occupation of producing sorghum grain for commercial purposes. The tax must be paid only by those who engage in that occupation, and that it must be paid by all so engaged except with respect to grain that is consumed in the producer's operations without having been processed or handled in a commercial transaction. In our opinion the assessment is an occupation tax on a person engaged in an agricultural pursuit within the meaning of Article VIII, Section 1, of our Constitution. As observed by this Court in *Pullman Palace Car*:

That the tax contemplated by the act is an occupation tax is too clear for discussion.

\* \* \* \* \* \*

The subject of taxation is the thing or business done; the occupation followed for and on account of which the tax is imposed on persons and corporations that pursue it.

The judgment of the trial court is reversed, and judgment is here rendered: (1) that appellee take nothing; (2) declaring that Article 55c is unconstitutional in so far as it requires payment of assessments; (3) permanently enjoining appellee from attempting, by legal proceedings or otherwise, to compel the payment of assessments by producers or collect from processors assessments not paid by producers; and (4) adjudging all costs against appellee.

Dissenting opinion by McGEE, J., in which DENTON and SAM D. JOHNSON, JJ., join.

Dissenting opinion by DANIEL, J.

McGEE, Justice (dissenting).

I respectfully dissent. I do not believe that the constitutional provision on which

the majority relies[1] was intended to prevent the type of program involved in this case. While this Court has had no previous opportunity to consider the Texas Commodity Referendum Act, the validity of the Act has been attacked on various state and federal constitutional grounds in two previous suits which were not appealed from the trial level.[2] The statute's constitutionality was upheld in both previous suits and by the court below in this suit. The majority now holds that the statute, which is designed to benefit the farmer and has been enthusiastically adopted by the agricultural community, contravenes a constitutional provision which was intended to protect the farmer. And the majority arrives at this holding without even mentioning the language or the purpose of the constitutional provision invoked.

I agree with the majority that the fact that the assessment is refundable at the option of the producer does not prevent it from being a tax. A monetary exaction loses its voluntary character when the individual loses the right to refuse to pay, not when he loses the right to eventually recover the payment. However, I cannot agree that once the conclusion that assessments under Article 55c are taxes is reached, "it is clear that the assessment is an occupation tax within the meaning of Article VIII, Section 1, of the Texas Constitution." Nor do I believe that the cases cited by the majority require that conclusion. None of those cases construes the constitutional provision involved in the instant case; none considers a tax with the attributes of the one involved here; none turns on whether the tax is an occupation tax on an agricultural pursuit; and none

discusses the purpose for the constitutional prohibition of such taxes.

The primary case relied upon by the majority, and the case which appellants argue is controlling, is H. Rouw Co. v. Texas Citrus Commission, 151 Tex. 182, 247 S. W.2d 231 (1952). It is true that in *Rouw* a similar assessment program imposed upon citrus fruit packers was called an "occupation tax" and held unconstitutional. However, the constitutional defect in *Rouw* was not that the program constituted an occupation tax on an agricultural pursuit, but that natural persons were exempt while corporations were taxed. This discrimination was held to violate not only Article VIII, Section 2 of the Texas Constitution, dealing with occupation taxes, but also Article VIII, Section 1 of the Texas Constitution and Section 1 of the 14th Amendment to the United States Constitution. These latter two constitutional provisions prohibit arbitrary discrimination in the imposition of any tax. Bluitt v. State, 56 Tex.Cr.R. 525, 121 S.W. 168 (1909); Grayson County State Bank v. Calvert, 357 S.W.2d 160 (Tex.Civ.App.—Austin 1962, writ ref'd n. r. e.); Quaker City Cab Co. v. Pennsylvania, 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927 (1928). Therefore, the assessment program in *Rouw* was held invalid because it was a tax, not because it was an occupation tax.

The opinion in *Rouw* shows that the Citrus Commission's primary contention was that the asssessment program involved was not a revenue raising measure (tax) but was a regulatory measure (license fee) and therefore the above constitutional provisions did not apply. The language quoted from *Rouw* by the majority is directed at

1. Tex.Const. art. VIII, § 1, which provides in pertinent part:

"The Legislature . . . may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State. It may also tax incomes of both natural persons and corporations other than municipal, except that persons engaged in mechanical and agri-

cultural pursuits shall never be required to pay an occupation tax."

2. Lance v. Texas Wheat Producers Association, No. 4035 in 84th District Court of Ochiltree County, Texas (December 21, 1971); Lance v. White, No. CA-2-1222 in U.S. District Court of the Northern District of Texas (Dismissed for lack of substantial federal question, March 21, 1973).

this contention and, read in context, clearly holds only that the primary purpose of the statute involved was to raise revenue and thus the assessment was not a license fee. The label "occupation tax" was used only to distinguish a revenue raising measure from a regulatory measure. On motion for rehearing, the Citrus Commission raised the ingenious but unmeritorious argument that if the assessment were an occupation tax it was an occupation tax on an agricultural pursuit and Article VIII, Section 1 of the Texas Constitution ( . . . *persons* engaged in . . . agricultural pursuits shall never be required to pay an occupation tax) required the discrimination found objectional, since natural persons could not be subject to the tax but corporations could. In disposing of the contention this Court made clear that it did not intend to hold that the assessment was an occupation tax as opposed to any other kind of tax or revenue raising measure. The opinion on rehearing begins:

> "On original submission all parties briefed and argued the case on the premise that unless the tax levied were a license, or privilege tax, as distinguished from a revenue raising measure, (which all parties called an occupation tax), the tax in question violated the constitutional requirements that it must be equal and uniform."

It is instructive that in the original opinion the assessment program was freely referred to as an occupation tax; but in the opinion on rehearing, when the distinction between "revenue raising measure" and "occupation tax" was before the Court, the assessment was never called an occupation tax. I do not believe that *Rouw* can be fairly read as holding that the assessment involved there was an occupation tax in the constitutional sense, much less that the assessment involved here is such a tax.

Nor do I find much help elsewhere in the jurisprudence of Texas in discovering what the term "occupation tax" means in the Texas Constitution. It has been said that Texas "evidences an occupation tax complex, the Legislature under the slightest pretext characterizing a given imposition as a tax upon an 'occupation' . . . ." M. Mahany, Texas Taxes 557 (1946). The United States Supreme Court has noted that a tax which the Texas Legislature called an occupation tax was actually "an excise laid on the production of oil, measured by the extent of the production, and charged ratably against all who have an interest in the oil produced." Barwise v. Sheppard, 299 U.S. 33, 37, 57 S.Ct. 70, 71, 81 L.Ed. 23 (1936). In discussing a tax on admission fees to amusements, another federal court said, "It may be an occupation tax under the elastic concept of that term in Texas but it is not an occupation tax in the strict sense." Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Sheppard, 123 F.2d 773 (5th Cir. 1941). Opinions of Texas courts are likewise of doubtful value in the present case since the label "occupation tax" has often been loosely used in holding that certain impositions are not other types of taxes, are not license fees, or do or do not suffer from various constitutional defects other than those concerning occupation taxes. *See*, e. g., Western Union Tel. Co. v. State, 55 Tex. 314 (1881) (held: tax not invalid as regulation of interstate commerce); Pullman Palace Car Co. v. State, 64 Tex. 274 (1885) (held: not tax on property, not tax on persons, not equal and uniform); State v. Galveston, H. & S. A. Ry. Co., 100 Tex. 153, 97 S.W. 71 (1906), rev'd 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031 (held: equal and uniform, not interference with interstate commerce); Texas Co. v. Stephens, 100 Tex. 628, 103 S.W. 481 (1907) (held: not ad valorem tax etc.); Hurt v. Cooper, 130 Tex. 433, 110 S. W.2d 896 (1937) (held: not license fee, equal and uniform).

An analysis of the "occupation tax" cases reveals only that occupation taxes are revenue raising measures imposed upon occupations. This obvious tautology is suffi-

cient to distinguish license fees and other types of taxes such as property taxes and is therefore normally an adequate method of classification since few situations arise where it is important to determine whether a particular measure is or is not an occupation tax in the constitutional sense.[3] However, when such a situation arises, as it has in this case, the semantic problems of labeling must be disregarded and a closer examination of the constitutional meaning of "occupation tax" must be undertaken.

The inquiry must start with a presumption that the legislature understood and correctly interpreted the constitutional prohibition. Smith v. Davis, 426 S.W.2d 827 (Tex.1968). "Both the constitutional provision and the questioned statute are to be liberally construed in favor of constitutionality." Robinson v. Hill, 507 S.W.2d 521, 524 (Tex.1974). The search is to determine "the purpose, meaning and intent of the framers of the Constitution." Western Co. v. Sheppard, 181 S.W.2d 850, 853 (Tex.Civ.App.—Austin 1944, writ ref'd). As this Court said in Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 55, 76 S.W.2d 1007, 1012, 96 A.L.R. 802, 809 (1934):

"[T]he problem before us will be solved when we ascertain the meaning of that language as generally understood when the Constitution was adopted.

" . . .

"Generally it may be said that in determining the meaning, intent, and purpose of a law or constitutional provision, the history of the times out of which it grew, and to which it may be rationally supposed to bear some direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry."

With these principles in mind, a reading of the pertinent constitutional provisions, together with the appropriate portions of the constitutional convention journal, Journal of the Constitutional Convention of Texas, 1875 (1875), and the debates of the delegates, S. McKay, Debates in the Texas Constitutional Convention of 1875 (1930), convinces me that the tax imposed by the Texas Commodity Referendum Act is not an occupation tax as understood by the framers of the Constitution and as prohibited upon persons engaged in agricultural pursuits.

The Constitution itself makes no attempt to define what an occupation tax is. In the parlance of the day, a variety of measures were enacted as occupation taxes and were popularly known as income taxes. Miller, The Historical Development of the Texas State Tax System, 60 Southwestern Historical Quarterly 1, 4 (1951). In considering the subject of Revenue and Taxa-

3. It appears that the question of whether a measure is an occupation tax in the constitutional sense can arise in only three ways. The instant case illustrates one way—the measure is attacked as an occupation tax on an agricultural or mechanical pursuit. See Western Co. v. Sheppard, 181 S.W.2d 850 (Tex.Civ.App.—Austin 1944, writ ref'd); Gerard v. Smith, 52 S.W.2d 347 (Tex.Civ. App.—El Paso 1932, writ ref'd). A second method would be a claim that an exaction levied by a county, city or town is an occupation tax exceeding one half of the tax levied by the State in violation of Art. VIII, § 1. See Brown v. City of Galveston, 97 Tex. 1, 75 S.W. 488 (1903); Hoefling v. City of San Antonio, 85 Tex. 228, 20 S.W. 85 (1892). A third method would be a claim that a state tax is an occupation tax without one fourth of the revenue set apart for the public

free schools as required by Art. VII, § 3. There seem to be no cases on this proposition, but see Tex.Att'y Gen.Op. No. V–1027 (1950). It might seem that the question could arise in a fourth manner by a claim that a tax was an occupation tax and not equal and uniform within classes as required by Art. VIII, § 2 and many cases have gone off on this ground. However, Art. VIII, § 1 requires all taxes to be equal and uniform and it is difficult to imagine a particular measure violating Art. VIII, § 2 as an occupation tax without also violating Art. VIII, § 1 as a tax. See H. Rouw Co. v. Texas Citrus Commission, 151 Tex. 182, 247 S.W.2d 231 (1952). Therefore, in deciding an "equal and uniform" attack it is necessary only to determine if the measure is a tax and not whether it is also an occupation tax.

tion, the delegates to the 1875 convention were primarily concerned with promoting frugality in state government by restricting the taxing power. See Braden, et al., The Texas Constitution: An Annotated and Comparative Analysis, Article VIII, Introductory Comment. They "endeavored to define a system of taxation based upon consideration of natural rights and upon correct principles of political economy, limiting the assessment and expenditure strictly to legitimate objects of government and to so guard the definement as to prevent future variances and abuses." Journal 378–379. All delegates seemed agreed that the primary method of raising state revenue should be ad valorem taxation. Journal 379; Debates 302, 307. Likewise, there was no argument against authorizing the legislature to levy a poll tax. Journal 464, 525; Debates 302, et seq.

However, there were strong differences of opinion on the subject of occupation taxes. The original report of the Committee on Revenue and Taxation provided, "Occupation taxes, being in their nature an infringement upon natural rights of persons, shall be laid only to discourage pursuits immoral in their tendency or not strictly useful, or as a discrimination against itinerant traders." Journal 379. A substitute article, taken primarily from the 1845 Constitution, was offered which included the provision, "The Legislature shall have power to levy an income tax, and to tax all persons pursuing any occupation, trade, or profession; *provided*, that the term occupation shall not be construed to apply to pursuits either agricultural or mechanical." Journal 451. Thereupon considerable debate upon the merits of the occupation tax ensued. Debates 295–309. Those opposing the occupation tax argued that it was a tax on brains and forced professional men to bear a disproportionate share of the burden of state government. Those supporting the occupation tax pointed out that it supplied a large portion of

the state's revenue and contended that it spread the tax burden fairly since it fell primarily on those who made substantial income without owning significant amounts of property and thus largely escaped ad valorem taxation. The latter view prevailed and the present provision was adopted. Journal 525–526.

From the above proceedings, I conclude that the delegates recognized that occupation taxes have a deterring effect when imposed upon an occupation. Despite this adverse effect, they adopted the concept of occupation taxes as an alternative to the property tax as a source of general revenue. Occupation taxes on agricultural and mechanical pursuits were forbidden to avoid discouraging people from pursuing those essential livelihoods and because it was felt that persons engaged in those pursuits carried their share of the common tax burden through ad valorem taxation.

The constitutional concept of an occupation tax is therefore that of a monetary charge imposed by a governmental body upon persons engaged in a certain pursuit for the purpose of raising general revenue for programs generally beneficial to that governmental body. The justification for such a tax is that the need for revenue to support generally beneficial programs outweighs the specific adverse effect on that particular occupation. Since the justification does not obtain for farmers and mechanics, such taxes on them are forbidden.

When the assessment program under the Texas Commodity Referendum Act is compared to this constitutional concept of an occupation tax, the differences become apparent. First, the assessment program is not imposed by the legislature upon the members of an occupation. The producers of a commodity must impose the assessment upon themselves by a substantial majority vote and may terminate the program at any time by a simple majority vote.[4]

4. While the majority did not mention this facet of the Texas Commodity Referendum Act, upon the petition of 10 percent of par- ticipating producers, the commodity producers board must hold a termination referendum at which a simple majority of the qualified pro-

The program is thus voluntary, not to the individual, but to the occupation. Second, the assessment program does not raise general revenue to support programs generally beneficial to the state. The legislature may not set the rate of the assessment and has no power to spend the proceeds. The producers elect a board from their own ranks to levy the assessment, provide for its collection, and spend the proceeds solely on programs of primary benefit to the producers. This is in direct contrast to the normal occupation tax situation where the adverse effect on the occupation is justified by the general benefit to the levying body.

The above factors convince me that the framers of the Texas Constitution did not intend to prohibit such programs as the Texas Commodity Referendum Act when they prohibited occupation taxes upon agricultural pursuits. This conclusion alone is sufficient to justify my dissent. However, there is another reason why I cannot join in the majority opinion. I believe the constitutional provision involved is an outmoded and unnecessary restriction upon the legislative power and should not be given the broad interpretation which the majority imparts to it.

In the almost 100 years during which Texas has operated under her present Constitution, including the provision involved here, no statute has been held unconstitutional as an occupation tax on a mechanical or agricultural pursuit.[5] During the recent attempts to rewrite the Texas Constitution there was a noticeable lack of effort to include similar provisions in a new constitution. The Constitutional Revision Commission proposed a constitution which omitted all references to occupation taxes and noted in the accompanying commentary:

> "Requirements concerning occupation taxes were not included in the new constitution. Exemptions from occupation taxes for agricultural and mechanical pursuits contained in the 1876 Constitution have not been of historical importance." Texas Constitutional Revision Commission, A New Constitution for Texas: Text, Explanation, Commentary 141 (November, 1973).

The Finance Committee of the recently completed Texas Constitutional Convention of 1974 considered the subject of taxation at exhaustive length and prepared a majority report and several minority reports, none of which contained any restriction on the legislature's power to levy occupation taxes. Journal of the Constitutional Convention of Texas, 1974, 606–618 (1974). These reports were debated at length on the floor of the convention, numerous amendments were proposed, additional reports were prepared, but no attempt was made to insert any limitation on the levy of occupation taxes. Journal of the Constitutional Convention of Texas, 1974, 681–866, 1906–1955, 1974–1977, 2327–2342, 2367, 2379–2859 (1974). The delegates to the convention must have unanimously concluded that such limitations were a product of a bygone era and tax structure and served no useful purpose in today's society.

At a time when the original purpose for this constitutional restriction on the taxing power no longer obtains, it seems unfortunate to me that the majority opinion breathes new life into it and gives it a broader, more sweeping interpretation than is supported or required by the history of the provision.

---

ducers voting is sufficient to terminate the program. Tex.Rev.Civ.Stat.Ann. art. 55c, § 16.

5. A possible exception is Jackson v. State, 55 Tex.Cr.R. 557, 117 S.W. 818 (1908), which is sometimes cited for the proposition that a tax on barbers is an unconstitutional occupation tax on a mechanical pursuit. However, a reading of that opinion reveals that the court of criminal appeals discussed that contention and then failed to rely upon it, instead striking down the tax involved on the grounds that it was not equal and uniform. As previously discussed, and as the court of criminal appeals noted in its opinion, the equal and uniform requirement applies to all taxes, not just to occupation taxes.

I would hold that the assessment program under the Texas Commodity Referendum Act is not an occupation tax as that term is used in the Texas Constitution and would affirm the judgment of the trial court declaring the Act constitutional.

DENTON and SAM D. JOHNSON, JJ., join in this dissent.

DANIEL, Justice (dissenting).

I would hold that the statute in question, as explained in paragraphs two through four of the majority opinion, provides for an assessment (as distinguished from a tax) voluntarily levied by the producers of the commodity "upon themselves" for their own benefit, and that its essential nature as a voluntary assessment was not changed by the amendment providing for a system of initial mandatory payment of assessments so long as prompt refunds are available to those who do not desire to participate in supporting the program. Accordingly, I disagree with the majority opinion and respectfully dissent.