OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS
JOHN CORNYN

February 24, 1999

The Honorable Michael P. Fleming
Harris County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002-1891

Opinion No. JC-0001

Re: Whether a racetrack admission fee collected by a county to distribute to municipalities pursuant to the Texas Racing Act, *see* TEX. REV. CIV. STAT. ANN. art. 179e, § 6.17(a) (Vernon Supp. 1999), violates article VIII, section 1(f) of the Texas Constitution (RQ-1016)

Dear Mr. Fleming:

You ask whether a fee set forth in article 179e, section 6.17(a) of the Revised Civil Statutes, a racetrack admission fee that a county is authorized to collect to distribute to municipalities in the county, runs afoul of the limitations on county and municipal occupation taxes set forth in article VIII, section 1(f) of the Texas Constitution, which precludes counties and cities from levying occupation taxes unless the state has done so. A tax is an occupation tax if its primary purpose is to raise revenues in excess of the amount needed for regulation of the industry. *Conlen Grain & Mercantile, Inc. v. Texas Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 623-24 (Tex. 1975). Because a municipality has no authority to regulate a racetrack located outside its jurisdiction, we conclude as a matter of law that the admission fee at issue is an occupation tax. We are unable to determine whether the admission fee violates article VIII, section 1(f), however, because we cannot resolve whether the state has imposed an occupation tax on racetracks.

Article 179e, the Texas Racing Act (the "Act"), generally delegates the authority to regulate racing in this state to the Texas Racing Commission (the "Racing Commission"). *See generally* TEX. REV. CIV. STAT. ANN. art. 179e, §§ 3.02 - .22 (Vernon Supp. 1999). The Racing Commission regulates racetrack licensing and is expressly authorized to set application fees, *id.* § 6.03(e), license fees, *id.* § 5.01(b), and annual fees, *id.* § 6.18(b). In addition, the Act requires the Comptroller to collect a portion of each pari-mutuel pool[1] on behalf of the state and grants the Comptroller rule-making authority with respect to those duties. *Id.* §§ 4.01 - .06 (Comptroller's authority), 6.09, .091, .093 (setting forth state's entitlement to portion of pari-mutuel pools).

---

[1]"Pari-mutuel pool" means "the total amount of money wagered by patrons on the result of a particular race or combination of races, the total being divided into separate mutuel pools for win, place, show, or combinations." TEX. REV. CIV. STAT. ANN. art. 179e, § 1.03(19) (Vernon Supp. 1999).

In addition, section 6.17(a) of the Act, the provision about which you inquire, authorizes county and municipal racetrack admission fees. It provides as follows:

> A commissioners court may collect a fee not to exceed 15 cents as an admission fee to a licensed racetrack located within the county. If the racetrack is located within an incorporated city or town, the governing body of the city or town may collect a fee not to exceed 15 cents as an admission fee to a licensed racetrack located within the city or town. *If the racetrack is not located within an incorporated city or town, the court may collect an additional fee not to exceed 15 cents as an admission fee to a licensed racetrack located within the county for allocation among the incorporated cities or towns in the county. If the racetrack is not located in an incorporated city or town, the court shall collect the additional fee if requested to do so by the governing bodies of a majority of the incorporated cities and towns in the county.* Allocation of the fees shall be based on the population within the county of the cities or towns.

*Id.* § 6.17(a) (emphasis added). A county or municipality may not assess or collect any other license fee, privilege tax, excise tax, or racing fee on admissions to, or wagers placed at, a licensed racetrack. *Id.* § 6.17(d).

The Sam Houston Race Park (the "racetrack") is located in Harris County and is not located within an incorporated city or town. Apparently, Harris County assesses a 15 cent admission fee on the racetrack pursuant to the first sentence of section 6.17(a). The racetrack does not challenge the county admission fee. Pursuant to the portion of section 6.17(a) emphasized above, a majority of the incorporated cities and towns in Harris County has requested the Harris County Commissioners Court to impose an additional 15 cent racetrack admission fee. The racetrack has challenged the constitutionality of that fee under article VIII, section 1(f) of the Texas Constitution, which provides:

> The occupation tax levied by any county, city or town for any year on persons or corporations pursuing any profession or business, shall not exceed one half of the tax levied by the State for the same period on such profession or business.

TEX. CONST. art. VIII, § 1(f). Under article VIII, section 1(f), a county or municipality may not levy an occupation tax on a particular business unless the state has. *Hoefling v. City of San Antonio*, 20 S.W. 85, 88 (Tex. 1892). A statute authorizing a county or city to impose an occupation tax in the absence of a state occupation tax violates this constitutional limitation. *See Ex parte Terrell*, 48 S.W. 504, 505 (Tex. Crim. App. 1898).

Your query requires us to consider whether the admission fee is an occupation tax and, if we conclude that it is, whether the state has imposed an occupation tax on the racetrack, opening the door for a local occupation tax. We address only the specific fee at issue -- a section 6.17(a) admission fee on a racetrack, which is not located within an incorporated city or town, collected by a county and allocated to municipalities in the county on the basis of population. With respect to

the first issue, we conclude as a matter of law that this fee is an occupation tax. The resolution of the second issue, whether the state has imposed an occupation tax on the racetrack, presents a mixed question of law and fact that we cannot ultimately resolve.

For purposes of article VIII, section 1, courts distinguish between state and local occupation taxes and regulatory license fees. The test developed by the courts to determine whether a county or city fee is an occupation tax or a regulatory license fee has been summarized as follows:

> [T]he test is whether the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for regulation or for raising revenue. *Hurt v. Cooper*, 110 S.W.2d 896, 899 ([Tex.] 1937); *City of Fort Worth v. Gulf Refining Co.*, 83 S.W.2d 610, 617 ([Tex.] 1935). If the primary purpose of the exaction is for regulation, then it is a license fee; however, if the primary purpose of the exaction is to raise revenue, then it is an occupation tax, regardless of the name by which it is designated. *Hurt*, 110 S.W.2d at 899; *City of Fort Worth*, 83 S.W.2d at 617.

*City of Houston v. Harris County Outdoor Adver. Ass'n*, 879 S.W.2d 322, 326 (Tex. App.–Houston [14th Dist.] 1994, writ denied) (parallel citations omitted). The test for determining whether a state fee is an occupation tax or a regulatory license fee is no different. *See generally Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 460-63 (Tex. 1997). A state levy is an occupation tax if its primary purpose is to raise revenues in excess of the amount needed for regulation of the industry. *Conlen Grain & Mercantile, Inc.*, 519 S.W.2d at 623-24. A state levy is a regulatory license fee if its primary purpose appears to be that of regulation. *Hurt*, 110 S.W.2d at 899. An assessment of the primary purpose of a levy is made "from a consideration of the statute as a whole." *Id.* As this office noted in Attorney General Opinion JM-963, Texas court decisions look to the actual conferral of regulatory authority in determining whether a charge imposed is intended primarily for regulation or the raising of revenue. *See* Tex. Att'y Gen. Op. No. JM-963 (1988) at 8 ("Texas courts consistently have characterized as license fees, rather than as taxes, those charges that were imposed concomitantly with the actual conferral of regulatory authority. . . . Texas courts consistently have characterized as taxes, rather than as license fees, those charges that were imposed without the concomitant conferral of actual regulatory authority.") (citations omitted).

This judicial test has been applied to determine whether an admission fee is an occupation tax. *See State v. Rope*, 419 S.W.2d 890, 897 (Tex. Civ. App.–Austin 1967, writ ref'd n.r.e.) (concluding that admission fee was intended to raise revenue and was therefore an occupation tax). There are a number of cases from the 1960's characterizing state taxes on admissions as state occupation taxes. *See, e.g., Dancetown, U.S.A., Inc. v. State*, 439 S.W.2d 333 (Tex. 1969) (treating tax on admission to dance halls and other places of amusement as a state occupation tax); *Calvert v. McLemore*, 358 S.W.2d 551, 552 (Tex. 1962) (characterizing tax on admission to entertainments as state occupation tax); *Rope*, 419 S.W.2d at 897 (concluding that tax on admission to dance halls and other places of amusement was intended to raise revenue and was therefore state occupation tax). We are not aware of any recent case law characterizing either a state or local admission fee.

Applying the judicial test here, it appears that the racetrack admission fee at issue is an occupation tax as a matter of law for the simple reason that municipalities have no regulatory

authority with respect to racetracks located outside their jurisdictions. We believe regulatory authority is the authority to determine whether, when, or how a person or entity conducts business and that regulatory expenses are distinct from expenses for the services, infrastructure, or improvements a governmental entity provides to the general public. Authority to regulate the racing industry is vested in the Racing Commission and, to a lesser extent, the Comptroller. *See* TEX. REV. CIV. STAT. ANN. art. 179e, arts. 3-4 (Vernon Supp. 1999). We are not aware of any statute giving a municipality regulatory authority over racetracks located outside the municipality's jurisdiction. Although cities may incur infrastructure and law enforcement expenses as the result of their proximity to a racetrack, we have found no authority for the proposition that such expenses constitute *regulatory* expenses for purposes of the constitutional distinction between occupation taxes and license fees. For these reasons, we conclude that the admission fee at issue is intended to raise revenue rather than to pay for racetrack regulation and is therefore an occupation tax.

As noted above, however, we are unable to resolve whether the state levies an occupation tax on racetracks. Again, the Racing Commission regulates racetrack licensing and is expressly authorized to set application fees, *id.* § 6.03(e), license fees, *id.* § 5.01(b), and annual fees, *id.* § 6.18(b).[2] The primary purpose of the Racing Commission fees appears to be to regulate the industry. Under section 6.03(e) of the Act, the Racing Commission is required to set application fees in amounts that are reasonable and necessary to cover the costs of administering the Act. Racing Commission rules establishing these application fees indicate that the fees are intended to cover the commission's costs. *See* 16 TEX. ADMIN. CODE. § 305.69(a)-(d) (1998) (setting $50,000 processing charge, $25,000 investigation charge, and $15,000 hearing charge for class one racetrack and providing for refund of investigation and hearing charges if they exceed Racing Commission's costs). In addition, section 5.01(b) of the Act requires the Racing Commission annually to prescribe reasonable license fees for each category of license issued under the Act. *See, e.g., id.* § 305.69(e) (setting initial license fee for class one horse racetrack at $100,000). Finally, section 6.18(b) of the Act authorizes the Racing Commission to prescribe a reasonable annual fee to be paid by each racetrack licensee. This fee, together with the section 5.01(b) fee, must be in an amount sufficient to pay the costs of administering and enforcing the Act. *See* TEX. REV. CIV. STAT. ANN. art. 179e, § 6.18(b) (Vernon Supp. 1999). Fees collected by the Racing Commission under the Act must be deposited in the state treasury "to the credit of a special fund to be known as the Texas Racing Commission fund." *Id.* § 3.09(b). This fund is to be appropriated, in the first instance, for the administration and enforcement of the Act. *Id.* Unappropriated money remaining in the fund at the end of each biennium may be transferred to the general revenue fund and appropriated for any legal purpose. *Id.* If the Racing Commission fees are not sufficient to fund administration and enforcement of the Act, the legislature may appropriate money from the general revenue fund. *Id.* § 3.09(b).

---

[2]For Racing Commission rules establishing fees, *see* 16 TEX. ADMIN. CODE §§ 305.69(a) - (d) (setting $50,000 processing charge, $25,000 investigation charge, and $15,000 hearing charge for class one racetrack and providing for refund of investigation and hearing charges if they exceed Racing Commission's costs), (e) (setting initial license fee for class one horse racetrack at $100,000), .71(a) (annual fee for horse racetrack is composed of both base fee and daily fee based on handle for each performance conducted by the association), (b) (base annual fee for class one horse racetrack is $15,000), (c) (daily fee ranging from $275 to $2,750, depending on total handle) (1998).

Significantly, the Act also provides that the state is entitled to a portion of each pari-mutuel pool, monies which are collected by the Comptroller. *See id.* §§ 6.091, 6.093; *see also id.* §§ 4.01 - .06 (Comptroller's authority under Act). While the Act specifically provides that the Comptroller shall deposit the state's share of each pari-mutuel pool in the general revenue fund, *id.* § 3.09(a), other provisions of the Act specifically earmark some of these monies for administrative and enforcement costs. The purpose of these levies in some cases depends upon the extent to which general revenue funds have been allocated to the Racing Commission fund. The allocation of a subset of these fees changed as of January 1, 1999.

The amounts collected by the Comptroller pursuant to section 6.091(a), subsections (1)(B) and (C), for example, are not allocated to any specific purpose and appear to be revenue to the state. *Id.* § 6.091(a).[3] The amounts collected under section 6.091(a), subsections (1)(A) and (2), on the other hand, appear to be intended to reimburse the state for the costs of administering and enforcing the Act, at least until any appropriations from the general revenue fund are fully reimbursed. *See id.* The section 6.091(a), subsection (1)(A) allocation expired as of January 1, 1999. In addition, section 6.093 required a horse racing association to set aside certain amounts from each live pari-mutuel pool until January 1, 1999. *Id.* § 6.093(a)(1). All amounts set aside under that provision "shall be applied to the reimbursement of all amounts of general revenue appropriated for the administration and enforcement of this Act in excess of the cumulative amount deposited to the Texas Racing Commission fund until the earlier of" the date on which the excesses together with interest are reimbursed in full or January 1, 1999. *Id.* § 6.093(a)(3). Section 6.093(b) requires an association to set aside certain amounts for the state from live pari-mutuel pools after January 1, 1999. The statute does not prescribe the use of these funds. Presumably, these amounts will be deposited in the general revenue fund and will be subject to appropriation for any purpose.

---

[3]Section 6.091(a) requires a racing association to distribute to the state four shares from each simulcast pari-mutuel pool and each simulcast cross-species pool as follows:

> (1)(A) until January 1, 1999, an amount equal to 0.25 percent of each simulcast pari-mutuel pool and each simulcast cross-species simulcast pool as the amount set aside to reimburse the general revenue fund for amounts that are appropriated for the administration and enforcement of this Act and that are in excess of the cumulative amount of funds deposited in the Texas Racing Commission fund, until the excess amount and interest on the excess amount are fully reimbursed;

> (B) an amount equal to one percent of each simulcast pool as the amount set aside for the state; and

> (C) an amount equal to 1.25 percent of each cross-species simulcast pool as the amount set aside for the state;

> (2) an amount equal to 0.25 percent of each pool set aside to reimburse the general revenue fund for amounts that are appropriated for the administration and enforcement of this Act and that are in excess of the cumulative amount of funds deposited in the Texas Racing Commission fund, until the excess amount and interest on the excess amount are fully reimbursed.

Tex. Rev. Civ. Stat. Ann. art. 179e, § 6.091(a) (Vernon Supp. 1999).

"Because money is fungible, [the] determination [whether an assessment is a regulatory license fee or an occupation tax] is not controlled by whether the assessments go into a special fund or into the State's general revenue . . . . The critical issue is whether the assessment is intended to raise revenue in excess of that reasonably needed for regulation." *Texas Boll Weevil Eradication Found., Inc.,* 952 S.W.2d at 461. Given the complexity of the state pari-mutuel pool levies and the recent change in their allocation, we cannot conclude as a matter of law that the primary purpose of these levies is to raise revenue in excess of the amount reasonably needed for regulation of the racing industry. Nor can we make this determination as a matter of fact. In assessing whether a fee is an occupation tax or a regulatory license fee, a court is able to quantify the cost of regulating an industry and the amount of revenues generated by levies on the industry and to compare the two figures. *See, e.g., Harris County Outdoor Adver. Ass'n,* 879 S.W.2d at 329; *Producers Ass'n v. City of San Antonio,* 326 S.W.2d 222, 224 (Tex. Civ. App.–San Antonio 1959, writ ref'd n.r.e.). This office, however, is unable to develop an evidentiary record or to make findings of fact in the opinion process. Unlike a court, we cannot quantify and compare costs and revenues. Moreover, we believe it is entirely possible that even if the primary purpose of these levies is to raise revenue, a court could conclude that these sui generis levies are not state occupation taxes but rather fit some other classification. Furthermore, we note that under article VII, section 3 of the Texas Constitution one-fourth of the revenue derived from state occupation taxes "shall be set apart annually for the benefit of the public free schools." Because any determination that the pari-mutuel pool levies are state occupation taxes could have additional legal consequences, we are particularly reluctant to speculate on their proper classification.

In addition, even if we were able to determine whether the state levies an occupation tax on racetracks, yet another potential fact question would impede resolution of your query. Again, article VIII, section 1(f) of the Texas Constitution provides that a local occupation tax "shall not exceed one half of the tax levied by the State for the same period on such profession or business." A brief submitted by the racetrack argues that even if the state levies an occupation tax against racetracks, the fee at issue here is nevertheless unconstitutional because it is not expressly restricted to one-half the amount levied by the state. The county brief, on the other hand, contends that article VIII, section 1(f) does not require "the bases of state and local occupation taxes to be the same as to any given business or occupation." Memorandum from Hon. Michael P. Fleming, Harris County Attorney, to Hon. Dan Morales, Office of the Tex. Att'y Gen. 3 (Oct. 22, 1997) (on file with the Opinion Comm.). We are not aware of any case law addressing this issue. Even if we were to conclude that a local occupation tax need not be expressly tied to one-half the amount of the state occupation tax, we would be unable to assess whether the admission fee at issue comports with the constitutional limit as a matter of fact.

In sum, we understand that the municipalities in Harris County may incur expenses as a result of their proximity to the racetrack and that the legislature enacted the racetrack admission fee as a funding mechanism to assist cities with such expenses. While the purpose of the admission fee is laudable, it raises complex fact questions and legal issues that cannot be resolved in an attorney general opinion. In view of the ongoing legislative session, we suggest that interested parties work with the legislature to tie the admission fee to a clearly established state occupation tax on racetracks or to replace the admission fee with some other method to assist cities with racetrack-related expenses.

## S U M M A R Y

The racetrack admission fee set forth in article 179e, section 6.17(a) of the Revised Civil Statutes that a county is authorized to collect to distribute to municipalities in the county is an occupation tax. Whether the admission fee runs afoul of the limitations on county and municipal occupation taxes set forth in article VIII, section 1(f) of the Texas Constitution depends upon whether the state has imposed an occupation tax on racetracks. The determination whether the state has imposed an occupation tax on racetracks involves questions of fact and cannot be resolved by the Attorney General as a matter of law.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Prepared by Mary R. Crouter
Assistant Attorney General