CREEDMOOR MAHA WATER SUPPLY CORPORATION, et al., Appellants,

v.

BARTON SPRINGS–EDWARDS AQUIFER CONSERVATION DISTRICT, et al., Appellees.

No. 3–88–256–CV.

Court of Appeals of Texas, Austin.

Dec. 6, 1989.

Rehearing Denied Feb. 28, 1990.

Wesley G. Ritchie, Kendall, Randle, Finch & Osborn, Austin, for appellants.

Doug Caroom, Bickerstaff, Heath & Smiley, Jim Mattox, Atty. Gen., Jack Carter, Asst. Atty. Gen., Austin, for appellees.

Before POWERS, CARROLL and SMITH,* JJ.

POWERS, Justice.

Creedmoor Maha Water Supply Corporation and Cimarron Park Water Company, Inc. appeal from a trial-court judgment, rendered after a bench trial, in their suit for declaratory relief against the Barton Springs–Edwards Aquifer Conservation District and the State of Texas. Tex.Civ. Prac. & Rem.Code Ann. §§ 37.001–37.011 (1986 & Supp.1989). We will affirm the judgment.

## THE DISTRICT

The Barton Springs–Edwards Aquifer Conservation District is a subdivision of the State of Texas and an underground water district organized and validated under Chapter 52 of the Texas Water Code. 1987 Tex.Gen.Laws, ch. 429, at 1993. As such, the District received from the Legislature the powers and duties enumerated in Tex. Water Code Ann. §§ 52.151–52.173 (Supp. 1989). These were granted the District [i]n order to provide for the conservation, preservation, protection, recharging, pre-

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003 (1988).

vention of waste of the underground water of underground water reservoirs or their subdivisions, and to control subsidence caused by withdrawal of water therefrom, consistent with the objective of Article XVI, Section 59, of the Texas Constitution, . . . .

*Id.* § 52.021. The District, governed by a board of directors, may make rules; construct dams on land acquired by condemnation; drain surface waters; recharge underground reservoirs; sell, transport, and distribute surface and underground water; collect information; plan for its operations; employ engineers; grant permits for the drilling, equipping, completing, and altering of water wells; regulate the spacing and capping of water wells; and enforce by suit certain statutory obligations regarding water wells. The powers and duties of the District are confined to a geographical area delimited in the validating act of the Legislature. 1987 Tex.Gen.Laws, ch. 429, at 1993. The area lies over a part of the Edwards Aquifer in Central Texas and includes the well-known Barton Springs in Austin. The State's control over such waters, exercised by and through the District, recognizes the ownership and rights of landowners in underground waters. Tex. Water Code Ann. § 52.002 (Supp.1989).

## THE CONTROVERSY

Soon after its validation by the Legislature, the District's Board of Directors held meetings for organizational and other purposes. They eventually promulgated comprehensive rules regulating various aspects of the water contained in the Edwards Aquifer underlying the geographical area committed to the District's authority. The rules deal with the prevention of waste and pollution, establish a permit system for all wells in the District, require the measurement by meters of water withdrawn through wells, and provide for certain other matters. Included in the rules are provisions which impose charges on water withdrawn through any "nonexempt" wells for which a permit is required, being basically those which have a daily production capacity in excess of 10,000 gallons. The charges are referred to as "user" fees. The amount of the charge is calculated according to a rate established annually by resolution of the Board of Directors. The act validating the District expressly permits such charges, provided they are "reasonable" in amount, while prohibiting the District to impose taxes, as a source of revenue, unless its power to impose the "user fees" is found to be unconstitutional.

Creedmoor and Cimarron obtain water from wells that are subject to the charges mentioned above. They sell, transport, and distribute the water, through their facilities, to customers within and adjacent to the District's boundaries. Believing the charges or "fees" amounted to taxation imposed in violation of the validating act, and in violation of various constitutional limitations and guarantees, Creedmoor and Cimarron sued the District praying for a declaratory judgment to that effect. They prayed as well for declarations that certain other actions of the District were invalid on specified grounds.

Following a bench trial, the court below denied Creedmoor and Cimarron all relief, and filed findings of fact and conclusions of law in support of the judgment. Creedmoor and Cimarron appeal on the several points of error discussed below.

## VALIDITY OF THE "USER" FEES

In their first four points of error Creedmoor and Cimarron contend they established as a matter of law that the user fees are "taxes," or that the trial court's determination to the contrary is so against the great weight and preponderance of the evidence as to be manifestly wrong. *See generally In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361, 363–64 (1960). Actually, the briefs furnished by Creedmoor and Cimarron make their contentions turn not upon evidentiary matters but upon the law applicable to the undisputed facts. We shall summarize their argument.

If the "primary purpose" of the charges is to raise revenue, as opposed to subsidiz-

ing the cost of regulation, the charges in question must amount to taxation. This distinction is well established. *Conlen Grain & Mercantile, Inc. v. Texas Grain Sorghum Producers Board,* 519 S.W.2d 620 (Tex.1975); *H. Rouw Co. v. Texas Citrus Commission,* 151 Tex. 182, 247 S.W.2d 231 (1952); *Hurt v. Cooper,* 130 Tex. 433, 110 S.W.2d 896 (1937); *Taxation–License Fee–Occupation Tax–Distinction,* 14 Texas L.Rev. 278 (1936); 1 Cooley, *Taxation* (4th ed. 1924) § 1; 4 Cooley, *Taxation* (4th ed. 1924) § 1784. Contending the charges in issue have the primary purpose of raising revenue, Creedmoor and Cimarron point out that the validating act authorizes the District to *protect* and *recharge* the underground water reservoirs, in addition to conserving and preserving them and preventing the waste of waters found there. Tex.Water Code Ann. § 52.021 (Supp.1989). The protection and recharging of the reservoirs is not, they imply, "regulation." These "non-regulatory" powers are important, they say, because they enable the District lawfully to acquire land, construct dams, install equipment to recharge the reservoirs, drain lakes, and erect facilities to transport water, *Id.* § 52.155; and the District is expressly authorized to expend revenue from the charges in question "to pay all or part of the principal of and interest on district bonds or notes." 1987 Tex.Gen.Laws, ch. 429, § 2(c)(3), at 1993. Consequently, Creedmoor and Cimarron fear the revenues generated by the charges will be applied not to the "regulation" of water use alone, but to any number of expensive projects that the District might undertake outside the sphere of "regulation." On a silent premise that discouraging water consumption is the only permissible act of "regulation," Creedmoor and Cimarron argue that the charges cannot have that discouraging effect because they, and other water-supply corporations, will merely pass the charges through to their customers in the form of proportionately higher rates; and the other large user, the City

of Austin, cannot be discouraged in its consumption because its maximum charge is fixed in all events at 40% of the total imposed against the other large users. We disagree with the argument.

The judgment below implies a determination that the primary purpose was regulation as opposed to the raising of revenue. *Reed v. City of Waco,* 223 S.W.2d 247, 255 (Tex.Civ.App.1949, writ ref'd). We must presume every reasonable intendment in favor of a constitutional assessment of the charges. *Ex parte Cramer,* 136 S.W. 61, 62 (Tex.Cr.App.1911); *Prudential Health Care Plan v. Comm'r of Ins.,* 626 S.W.2d 822, 827 (Tex.App.1981, writ ref'd n.r.e.). Creedmoor and Cimarron labored under an obligation to demonstrate that the charges bore no reasonable relationship to the legitimate regulatory objectives set for the District by the Legislature. *City of Fort Worth v. Gulf Refining Co.,* 125 Tex. 512, 83 S.W.2d 610, 618–19 (1935).

The objectives assigned the District are "to provide for the conservation, preservation, protection, recharging, and prevention of waste of the underground water" in the parts of the Edwards Aquifer committed to the District's authority, and "to control subsidence caused by withdrawal of water therefrom . . . ." Texas Water Code Ann. § 52.021 (Supp.1989). Creedmoor and Cimarron argue from a premise that "regulation" cannot, as a matter of law, encompass the protection and recharging of the underground waters in those parts of the Edwards Aquifer committed to the District's authority; consequently, the costs of such protection and recharging cannot be included in the cost of "regulation." Therefore, they reason, the statutory provisions authorizing the disputed charges to be allocated for those non-regulatory purposes must result in their being classified as "taxes." We disagree.

In the circumstances of the present case, the concept of "regulation" [1] means simply

---

1. The English words "regulation," "regulatory," "regulator," and "regulative" all incorporate the meaning implicit in the transitive verb "regulate." "Regulate" derives jointly from the Latin words *rego* and *regula,* and obtains from them a

combination of two ideas. *Rego* means to command, govern, fix, direct, guide, or control persons and their activities, as well as inanimate objects and other matters. *Regula* means a basic principle, rule, or standard. *Oxford Latin*

the District's authority to *control* the underground water in that part of the Edwards Aquifer lying within the District boundaries, and the exercise of that control, in the public interest, toward achieving the six objectives assigned by the Legislature. Regulation is the designated *means* for achieving those objectives, and it is therefore difficult to comprehend a theory that two of those *objectives* cannot amount to "regulation" as a matter of law. But that is the theory argued to us by Creedmoor and Cimarron, and we shall address it as best we can.

The six objectives stated in § 52.021 are, of course, quite broad, and the entirety of Chapter 52 of the Texas Water Code manifests a plain intention on the part of the Legislature to give underground water conservation districts the powers necessary to achieve those objectives. Still, these objectives and powers are limited in the sense that they pertain ultimately to the underground waters within the District's boundaries. Should the District choose to acquire land by condemnation, build dams thereon for the impoundment of surface waters, recharge underground reservoirs, or sell, transport, and distribute surface and underground water in the future, these undertakings must bear some reasonable relationship to the legislative objectives *and* the waters in the Edwards Aquifer lying within the District's boundaries. If

they do not, the District undertakings would be *ultra vires* of its delegated authority. Creedmoor and Cimarron must, therefore, argue only an abstraction and a contingency—that the District might *in the future* incur costs for recharging and protecting the underground waters within the District's boundaries; and, for that reason, we must now condemn the charges in question as tantamount to taxation because the two purposes lie for some reason outside the scope of "regulation." If they do, we cannot assume the District will act *ultra vires* or unconstitutionally in the future; nor may we assume that any such actions will not simultaneously amount to "conservation" or another objective with which Creedmoor and Cimarron do not quarrel as falling within their concept of "regulation."

The present circumstances do not invoke the holdings in *Hurt* (where the revenue generated by the fee, over and above the cost of regulation, was directed to the available-school fund and the general-revenue fund), *H. Rouw Co.* (where the excess in revenue was directed to named funds to advertise and enlarge the markets for Texas citrus fruit and its by-products, as well as research beneficial to the citrus industry), or *Conlen* (where the charge was directed to various programs designed to encourage the production, marketing, and use of a product in connection with which the charge was imposed). *Hurt*, 110 S.W.2d

*Dictionary* (1983). In common usage, therefore, the word "regulate" blends the two ideas and means to control, govern, or direct by rule or regulation; to subject to guidance or restriction; to bring or reduce to order; to correct by control; to adjust with reference to some standard or purpose. *The Compact Edition of the Oxford English Dictionary* (1971).

Legal usage corresponds basically to common usage of the word "regulate" and its derivatives, the meaning in a particular case being determined by the circumstances. The word "regulate" is therefore sufficiently broad and comprehensive to permit a variety of meanings, and a liberal or restricted construction as the nature of the case requires. *Southwestern Telegraph & Tel. Co. v. City of Dallas*, 174 S.W. 636, 641 (Tex.Civ.App.1915, writ ref'd); *Tolle v. City of New Braunfels*, 154 S.W. 345, 347 (Tex.Civ.App. 1913, no writ); *see generally*, 76 C.J.S. Regulate at 610–16 (1952 & Supp.1989).

In administrative law, the word "regulate" and its derivatives may also serve a particular func-

tion—they often distinguish some administrative agencies from others according to the nature of the powers and authority exercised. For example, all administrative agencies exercise governmental powers delegated to them by a legislative body, but the expression "regulatory agency" commonly refers only to those agencies given authority and power to prescribe what *private* persons shall do or not do in particular circumstances. They accomplish this by powers classified broadly as licensing, ratemaking, and control over business practices. In their authority over private persons and activities, "regulatory agencies" differ from other administrative agencies exercising government power in purely governmental matters, such as military and foreign affairs, the provision of public services by governmental entities, and the internal management of the executive branch of the government generally. Schwartz, *Administrative Law* §§ 1.2 at 5–6, 1.7 at 15–16 (1984).

896, *H. Rouw Co.,* 247 S.W.2d 231, and *Conlen,* 519 S.W.2d 620.

We therefore overrule the contentions advanced by Creedmoor and Cimarron wherein they argue that the charges in question amounted to taxation as opposed to a permissible regulatory fee.

■ In other points of error, Creedmoor and Cimarron contend the trial court erred because the charges will be imposed in a scheme that is discriminatory and devoid of any reasonable and just relationship to the purposes for which the charges are levied. *See generally Prudential,* 626 S.W.2d 822. They argue that all users of underground water in the District will benefit from the District's undertakings, but only a few of the users will pay the charges—those who take water through the large "nonexempt" wells. Moreover, they argue, the charges cannot impede the drawing of water from the aquifer, as a practical matter, because the charges are imposed only upon the production of water from 133 "nonexempt" wells, and these wells draw only eight percent of the total quantity of water passing through the aquifer. The balance is drawn through wells exempt from the charges, or issues from Barton Springs to flow unused into the Colorado River. Finally, they complain that the scheme discriminates without substantial basis between users who are not exempt from the charges—themselves and others who take from wells having a capacity to draw water in excess of 10,000 gallons daily—and the City of Austin, which may be required to pay up to 40% of the total amount paid by the other non-exempt users, irrespective of the quantity of water it may use. We reject the argument because we find a substantial basis for the classifications in question.

The classifications find reasonable support in the evidence which shows that those who take from wells subject to the charges draw 81% of all water taken by wells from the aquifer. There are 133 such wells compared to 1,475 wells that are exempt from the charges. The 1,475 exempt wells draw only 19% of the total water pumped from the aquifer. Subjecting the exempt wells to charges would substantially increase the cost of regulation, under the trial court's findings, without materially advancing the legislative objectives that may adequately be pursued by subjecting only the large producers to the charge. The small domestic users remain, however, subject to other forms of regulation imposed by the District rules. The loss of water in the systems served by the larger wells, operated by the water-supply corporations, is a far greater problem than it is in those exempt wells serving less than five households; and while the customers of these corporations will ultimately absorb the charges, they receive in compensation the guarantee of continuous and adequate service, under the applicable law, while those who take from the exempt wells do not have such assurances.

Concerning the charges authorized to be imposed against the City of Austin, the evidence shows that it is situated differently from the other large users in that Austin uses water from the aquifer that issues naturally through Barton Springs and enters the Colorado River. Unless captured and used, these waters would flow unused into the Gulf of Mexico. The magnitude of such waters was estimated to be 40% of the total quantity of water subject to the charge, the estimate being then placed in the statute as a maximum percentage that may be charged the City. We believe this to be a reasonable basis for the different method of calculating the charges imposed upon the City of Austin.

The burden lay on Creedmoor and Cimarron to demonstrate that the orchestration of the various factors by the District, and its resulting choices, were arbitrary and unreasonable. *Dodgen v. Depuglio,* 146 Tex. 538, 209 S.W.2d 588, 593 (1948); *Hurt,* 110 S.W.2d at 901. "The lines must be drawn somewhere, and . . . the determination of where to draw them is for the Legislature and not for the courts." *Hurt,* 110 S.W.2d at 903. The Legislature chose to draw the line between domestic users and large producers on the basis of the 10,000 gallon daily capacity; it chose to draw the line between the City of Austin and the large producers at 40%, based upon

the differences between them and the estimates of water usage outlined above. The trial court was bound to assume the constitutionality of the statute and the official scheme adopted thereunder by the District, and to sustain that scheme if there could exist a state of facts that justified the classifications adopted therein. *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632 (1958); *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162 (1959); *Reed*, 223 S.W.2d 247. We hold Creedmoor and Cimarron have not shown the classifications to be arbitrary and unreasonable.

## VIOLATIONS OF THE OPEN MEETINGS ACT

Creedmoor and Cimarron raise several points of error in which they contend the trial court erred in not holding invalid certain actions taken by the District's Board of Directors, based upon a theory that the actions were voidable by a court for want of compliance with the requirements of the Open Meetings Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17 (1987 & Supp.1989).

### *Emergency Meeting*

■ The posted notice of one meeting declared that an emergency existed that precluded posting of the notice for the requisite period of 72 hours in advance of the meeting. The District posted the notice more than two hours before the meeting, stating that an emergency existed, but nothing in the notice described or otherwise identified the nature of the emergency. Section 3A(h) of art. 6252–17 permits meetings on two-hours notice in cases of emergency. At the time the notice was posted in the present case, § 3A required that the emergency be "expressed" in the notice; presently the section requires that the emergency be "clearly identified" in the notice. *See* 1987 Tex.Gen.Laws, ch. 549, § 5(h), at 2213. The earlier version was interpreted as requiring only a statement that an emergency existed, as opposed to some description of the emergency or the facts giving rise to it. *River Road Neighborhood Ass'n v. South Texas Sports*, 720 S.W.2d 551, 554 (Tex.App.1986, writ

dism'd). In their brief, Creedmoor and Cimarron concede that interpretation.

They complain, however, that the trial court erred in failing to hold invalid the actions taken at the emergency meeting because: (1) the minutes of the meeting "contain[ed] no evidence of an actual emergency situation," within the statutory definition of "emergency;" and (2) the District, in the trial of the present case, "offered no evidence of any emergency which existed at the time of this meeting." These complaints rest upon a silent premise that the District labored under a legal duty to place in its minutes the "evidence" or factual matter from which it inferred that an emergency existed before the meeting, and a legal duty to offer evidence and persuade the trier of fact, in district court, that an emergency did in fact exist immediately before the meeting.

Creedmoor and Cimarron fail entirely to cite in their brief any authority for their premise. We find none. The former would seem to require some statutory provision affirmatively setting out the legal duty. The latter contradicts the well-established presumption of validity that attends the official acts of those legally charged to govern the District in its administration of Chapter 52 of the Texas Water Code. *Trapp v. Shell Oil Co.*, 145 Tex. 323, 198 S.W.2d 424, 439 (1946). We therefore overrule the points of error complaining of the determination and notice that preceded the emergency meeting.

We should say, however, that we have only assumed that we have the power to review the District's determination that an emergency existed that justified a public meeting with less than the ordinary 72–hour advance notice. In *Cameron County Good Government League v. Ramon*, 619 S.W.2d 224, 231 (Tex.Civ.App.1981, writ ref'd n.r.e.) and *Garcia v. City of Kingsville*, 641 S.W.2d 339, 341 (Tex.App.1982, no writ), the courts concluded that such a power was indispensable to the effectiveness of art. 6252–17, and that the power of judicial review therefore existed under § 3 of the statute. We take no position on the matter by our opinion herein.

## Full Disclosure

■ Creedmoor and Cimarron complain of the trial court's failure to invalidate certain actions taken at two meetings of the Board of Directors. They base their complaint on a theory that the text of the posted notice that preceded each meeting failed to make full disclosure of a subject discussed at the meeting, as required by art. 6252–17 § 3A(a). *See Cox Enterprises, Inc. v. Bd. of Trustees,* 706 S.W.2d 956, 958–60 (Tex.1986); *Texas Turnpike Authority v. City of Fort Worth,* 554 S.W.2d 675, 676 (Tex.1977); *Lower Colorado River Authority v. City of San Marcos,* 523 S.W.2d 641, 646 (Tex.1975).

Section 3A(a) of the statute requires that "[w]ritten notice of the ... subject of each meeting held by a governmental body shall be given before the meeting...." *City of San Marcos* and *City of Fort Worth* declare that notice of the subject matter is sufficient when it alerts the reader that some action will be taken relative to a topic, and it is not necessary that the notice state the consequences that would flow from such action. *Cox Enterprises* declares that "full disclosure" is necessary for "substantial compliance" with § 3A(a), and "full disclosure" requires, in view of the purposes of the statute, a correspondence between the likely degree of public interest in a topic and the specificity with which the topic is stated in the notice.

The notice of one meeting stated that the temporary Board of Directors would meet to "consider report and possibly take action on: report on cooperative election funding/reimbursement agreements." Under this notice, the temporary Board of Directors met and authorized the making of cooperative agreements with the cities of Buda, Hays, and Sunset Valley, whereby these small cities would advance the costs of an election and other organizational expenses necessary to the creation of the District. *See* Tex.Water Code Ann. § 52.058 (Supp.1989). If the District failed of creation, the agreements provided that the small cities would not receive reimbursement. The District was bound to re-

pay the expenses if the election results authorized its creation. *Id.* § 52.061(a).

Creedmoor and Cimarron contend the description of the subject, quoted above, was insufficient to apprise the reader that the agreements pertained to organizational expenses separate and apart from election expenses. These organizational expenses amounted to $10,575.00. Section 52.261(a) (Supp.1989) of the Texas Water Code provides:

The district's directors may pay all costs and expenses necessarily incurred in the creation and organization of a district, legal fees, and other incidental expenses and may reimburse any person for money advanced for these purposes.

The meeting preceded the creation of the District. The notice in question listed nine items to be discussed in the meeting. All referred to various aspects of the creation process. The reader was assisted in understanding the phrase "cooperative election funding/reimbursement agreements" by the fact that reimbursement of the expenses in question was a matter governed largely by statutory provisions, of which all persons are presumed to be informed. For these reasons, we hold the notice sufficient to fully disclose the subject of "reimbursement agreements" as these were expressly distinguished in the notice from "election funding ... agreements."

■ The notice of another meeting stated that the temporary Board of Directors would meet to consider seven items, including:

\*     \*     \*     \*     \*     \*

Approval of City of Austin election agreement.

\*     \*     \*     \*     \*     \*

Creedmoor and Cimarron contend the notice was insufficient to inform the reader that the Board might accept, which it did, an agreement with the City of Austin providing for the District to reimburse the City for election expenses, the sums to be repaid within three years if the District was created. The expenses amounted to $192,500.00.

What we have said previously regarding the first notice applies as well to the provisions of the second notice. The agreement obligating the District to reimburse the City of Austin for election expenses was one authorized by statute. The election was unavoidable if the District were to be created, and the expenses would have to be borne by someone. The notice did not refer generally to an unidentified "agreement," but one which pertained to the "City of Austin" and to an "election." The description in question did not consist simply of an unadorned noun, such as "litigation" or "personnel" as condemned in *Cox Enterprises*. It is narrower, and hence more specific, as was the notice in *City of San Marcos* which referred to changes in electric-power rates within "the City of San Marcos." For these reasons, and those given previously, we hold the second notice sufficient.

## ULTRA VIRES ACTS

■ Creedmoor and Cimarron contend on other grounds that the trial court erred in failing to invalidate the District's agreements to repay the organizational expenses. They argue the agreements were *ultra vires* on three grounds: firstly that § 51.033 of the Texas Water Code prohibited the reimbursement agreements, made by the temporary directors with the cities of Austin, Buda, Hays, and Sunset Valley; secondly, that the agreements were not authorized by the validating statute; and thirdly, that the agreements amounted to a gratuity or lending of credit prohibited by Tex. Const. art. III, § 52.

Section 51.033 provides that the temporary Board of Directors of a district must issue and publish an order, calling for an election to confirm creation of the district within 30 days of its first meeting "and before the District may incur any indebtedness other than for its operation and the holding of an election." The election took place in the present case on August 8, 1987. Before that date, the temporary Board of Directors approved the agreements mentioned above, providing for the District to repay its organizational expenses if the election outcome was favorable to the creation of the District.

We hold the time limits of § 51.033 to be directory rather than mandatory, for there is nothing in the section or elsewhere in the Code which expressly prohibits the incurring of such expenses before the election, and nothing which declares such obligations void or voidable. *State v. Fox*, 133 S.W.2d 987, 990 (Tex.Civ.App.1939, writ ref'd). Consequently, we need not consider whether § 51.033, properly interpreted, permitted the agreements in question within the phrase "operation and the holding of an election" and the word "incur."

■ Creedmoor and Cimarron argue that the validating act, 1987 Tex.Gen.Laws, ch. 429 at 1993, does not authorize the District to utilize its basic source of anticipated revenue—the "user fees" charged for production of water from nonexempt wells—for the repayment of the organizational fees. Section 2(c)(3) of the act provides:

> The money collected from fees may be used by the district to manage and operate the district and to pay all or part of the principal of and interest on district bonds or notes.

They concede that § 52.261 of the Texas Water Code would authorize such payments from any source of revenue received by the District, but they argue that the validating act impliedly negates the authority given by § 52.261. In calling for that implication, Creedmoor and Cimarron were bound to demonstrate that the Legislature *obviously* intended the implication, for that is the only exception permitted to the general rule that implications may not be permitted to contradict or add to a statute. *Commonwealth of Massachusetts v. United North & South Dev. Co.*, 140 Tex. 417, 168 S.W.2d 226, 229 (1942).

Actually, however, they argue merely from silence: because the validating act does not expressly include authority to expend the fees for organizational expenses, the power does not exist even though § 52.261 authorizes such expenditures; and the validating act expressly provides in § 2(a)(1) that the District shall have the powers and authority given such districts

in Chapter 52 of the Texas Water Code. The argument imputes to the Legislature an unlikely intention that the District would not be allowed to pay its own organizational expenses from its only authorized source of revenue, even though the Legislature simultaneously authorized the District to pay those very expenses in § 52.261. We will not impute that unreasonable intention to the Legislature.

■ Finally, Creedmoor and Cimarron contend the District's reimbursement agreements amount to the lending of credit by the municipalities in question, or their granting of public money to the District. *See* Tex. Const. Art. III, §§ 50, 52. We do not agree. We hold the agreements to be made for a public purpose. *State v. Austin*, 160 Tex. 348, 331 S.W.2d 737, 744 (1960).

Accordingly, we affirm the judgment of the district court.